**HERCULES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Societe Nationale des Poudres et Explosifs, Defendant–Intervenor.**

**Court Nos. 83–07–00951, 83–07–01075, 83–09–01324 and 83–09–01325.**

United States Court of International Trade.

Oct. 20, 1987.

Dow, Lohnes & Albertson (William Silverman, John C. Jost, Margaret B. Dardess, and James M. McElfish, Jr., Washington, D.C., on the motions), for plaintiff and defendant-intervenor Hercules, Inc.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (J. Kevin Horgan, on the motions), Office of the Asst. Gen. Counsel, for Import Admin., U.S. Dept. of Commerce (Eileen P. Shannon, on the motions), and Office of the General Counsel, U.S. Intern. Trade Com'n (Randi S. Field, Washington, D.C., on the motions), for defendant.

Busby, Rehm & Leonard, P.C. (Will E. Leonard, James Taylor, Jr., Ruth Bale Lippincott and L. Daniel Mullaney, Washington, D.C., on the motions), for plaintiff and defendant-intervenor Societe Nationale des Poudres et Explosifs.

## MEMORANDUM OPINION

CARMAN, Judge:

Before the Court are four related cases arising out of the importation of industrial nitrocellulose from France. These cases result from challenges by both the domestic producer and the importer of the anti-dumping and the countervailing duty determinations.

In Court No. 83–07–00951 (CV2D 951), the domestic producer of industrial nitrocellulose, Hercules, Inc. (Hercules), moves pursuant to Rule 56.1 of the Rules of this Court for judgment upon the agency record challenging a portion of the countervailing duty findings of the United States Department of Commerce, International Trade Administration (Commerce) in *Final Affirmative Countervailing Duty Determination; Industrial Nitrocellulose From France*, 48 Fed.Reg. 11,971 (1983), *amended, Industrial Nitrocellulose From France; Amendment to Notice of Final Affirmative Countervailing Duty Deter-*

*mination,* 48 Fed.Reg. 25,254 (1983) (*Final CVD Determination*). In its second action, Court No. 83–09–01324 (LTFV 1324), Hercules moves for judgment upon the agency record challenging a portion of the less than fair value findings of Commerce in *Final Determination of Sales at Less Than Fair Value; Industrial Nitrocellulose from France,* 48 Fed.Reg. 21,615 (1983) (*Final LTFV Determination*).

The foreign producer and exporter of industrial nitrocellulose from France, Societe Nationale des Poudres et Explosifs (SNPE) has filed with this Court its Rule 56.1 motion challenging, in Court No. 83–07–01075 (CVD 1075), the same countervailing duty determination challenged by Hercules, *Final CVD Determination.* In this action, SNPE also challenges the injury determination of the United States International Trade Commission (ITC). Similarly, in Court No. 83–09–01325 (LTFV 1325), SNPE moves for judgment upon the agency record challenging the same less than fair value dumping investigation, *Final LTFV Determination,* challenged by Hercules in LTFV 1324. In addition, SNPE challenges the ITC injury determination in LTFV 1325.

### I. BACKGROUND

Industrial nitrocellulose (INC), the subject of the investigations, is a dry, white, amorphous, synthetic chemical which results from the action of nitric acid on cellulose and is extremely flammable. Industrial nitrocellulose contains between 10.8% and 12.2% nitrogen, differentiating it from explosive grades of nitrocellulose, which contain over 12.2% nitrogen. INC is stored and shipped wet with alcohol. Industrial nitrocellulose comes in several viscosities and is used in the production of lacquers, films, coatings, furniture finishes, and printing inks. The product has been classified as cellulosic plastic materials, other than cellulose ascetate, under item 445.-2500 of the Tariff Schedules of the United States (TSUS). Explosive grade nitrocellulose has a different classification under the TSUS. At the time of the investigation, SNPE was the sole French producer and exporter of INC to the United States.

Since 1978, Hercules was the sole United States producer of INC.

Prior to the creation of SNPE, the French Government had historically maintained a monopoly over trade in powders and explosives which extended to industrial nitrocellulose, a co-product of explosive grade nitrocellulose. The monopoly was operated by the Ministry of Defense through Service des Poudres (SP), one of the Ministry's divisions. Pursuant to the Treaty of Rome which established the European Economic Community (EEC) and in response to its treaty obligations, the French Government transferred, in exchange for stock, the commercial and industrial assets and operations of SP to SNPE, a newly formed public corporation. The French Government received over 99% of the outstanding stock of SNPE.

At the time of SNPE's incorporation, pursuant to French law, the employment of all military and civilian personnel of SNPE's predecessor, SP, was at the disposal of the president of SNPE. After a period of one year, these employees were permitted to be either placed again at the disposal of the Minister of Defense or recruited by SNPE in accordance with French labor laws. Employees with civil service status who remained with SNPE had the option of retaining that status and continuing to be subject to the conditions applicable to any facility under the jurisdiction of the Ministry of National Defense. Some employees continued to retain civil service status; however, all newly hired employees were not given this status.

### II. THE COUNTERVAILING DUTY INVESTIGATION

#### A. Introduction

On September 14, 1982, Hercules filed a countervailing duty petition with Commerce and the ITC alleging subsidies were being provided to French producers of INC by the Government of France (GOF). Hercules also alleged the United States INC industry was materially injured, or was threatened with material injury, by reason of imports of INC from France. On Sep-

tember 17, 1982, upon notification from Commerce, the ITC instituted a preliminary countervailing duty investigation of INC from France.[1] On October 4, 1982, Commerce instituted a preliminary countervailing duty investigation. *Initiation of Countervailing Duty Investigation; Industrial Nitrocellulose From France,* 47 Fed.Reg. 44,807 (1982).

The ITC issued an affirmative preliminary determination, on October 29, 1982. *Nitrocellulose From France; Determination,* 47 Fed.Reg. 51,024 (1982). The ITC determined there was a reasonable indication imports of INC from France were materially injuring, or threatening to materially injure, a U.S. industry. The vote of the Commission making the determination was unanimous.

On December 8, 1982, Commerce, at Hercules' request, declared the investigation "extraordinarily complicated," as defined in section 703(c) of the Tariff Act of 1930 (the Act), as amended, 19 U.S.C. 1671b(c) (1981), and extended the deadline for the preliminary determination from December 8, 1982 to December 22, 1982. Commerce made a negative preliminary determination on December 22, 1982, stating the Government of France was providing SNPE with certain benefits constituting subsidies within the meaning of the Act. However, the estimated *ad valorem* amount of the net subsidies was found to be *de minimis. Preliminary Negative Countervailing Duty Determination; Industrial Nitrocellulose From France,* 47 Fed.Reg. 58,330 (1982).

Commerce made a final affirmative countervailing duty determination on March 14, 1983. *Final CVD Determination.* Commerce found "certain benefits which constitute subsidies within the meaning of the

counterviling [sic] duty law [were] being provided to [SNPE]. ... [at] [t]he estimated net subsidy [of] 3.248 percent *ad valorem."* 48 Fed.Reg. at 11,971. The 3.248 figure, however, was amended to 3.604 on June 6, 1983. 48 Fed.Reg. 25,254.

Commerce, in its final determination, found the following benefits constituted countervailable subsidies:

(1) A grant from the Ministry of Defense to SNPE for plant modernization at Bergerac;

(2) Cross-subsidization of industrial nitrocellulose through military sales of nitrocellulose;

(3) Assumption of certain labor costs by the Government of France; and

(4) Tax and non-tax regional development incentives.

The ITA determined the following programs did not confer subsidies:

(1) The reorganization of the explosive powders and substances industry, pursuant to the Treaty of Rome, by creating SNPE;

(2) Equity infusions;

(3) Financing from Credit National;

(4) Research and development funding;

(5) Energy conservation grants;

(6) Labor assistance programs;

(7) Anti-pollution incentives; .

(8) Local business tax reductions;

(9) Equipment subsidies; and

(10) Input discounts.

Finally, the ITA determined that certain other government programs were not used by the French nitrocellulose producer.[2]

In accordance with 19 U.S.C. § 1671d, the ITC had 75 days after Commerce's affirmative final determination to deter-

---

**1.** Because France is a "country under the Agreement" within the meaning of Section 701(b) of the Tariff Act of 1930, as amended, 19 U.S.C. 1671(b) (1981), an injury determination was required by the ITC for this investigation.

**2.** Commerce determined the following programs were not used by SNPE:
 (1) FDES, a fund providing loans to businesses and corporations;
 (2) CDC, loans from a government lending institution;

 (3) FASAI, a program intended to encourage job creation and industrial diversification;
 (4) Loan guarantees;
 (5) FNE, a program offering vocational training, and relocation and early retirement allowances; and
 (6) Government retirement and layoff benefits.
48 Fed.Reg. at 11,975–76.

mine whether or not the imports were materially injuring or threatening to materially injure a U.S. industry. On March 22, 1983, the ITC instituted a final countervailing duty investigation of INC from France. *Nitrocellulose From France*, 48 Fed.Reg. 15,018 (1983). On June 15, 1983, the Commission transmitted its affirmative final countervailing duty determination and report to Commerce finding a U.S. industry was materially injured by imports of INC. *Nitrocellulose From France*, 48 Fed.Reg. 27,453 (1983). The vote of the Commission was 2 to 1, with Commissioner Stern dissenting. Thereafter, on June 22, 1983, notification of Commerce's countervailing duty order was published in the Federal Register. *Industrial Nitrocellulose From France; Countervailing Duty Order*, 48 Fed.Reg. 28,521 (1983).

Hercules initiated an action seeking judicial review of Commerce's countervailing duty order, CVD 951, on June 29, 1983. SNPE followed by filing an action challenging both Commerce's countervailing duty order and the ITC's injury determination, on August 19, 1983.

### B. Contentions of the Parties in Court No. 83–07–00951

In this case Hercules, the plaintiff domestic producer, contends the following:

(1) Commerce erred in utilizing an equity methodology rather than a grant methodology to calculate the cross-subsidization of industrial nitrocellulose sales by military nitrocellulose sales;

(2) Commerce incorrectly determined that the creation of SNPE and its modernization were consistent with commercial considerations. Commerce also erred in finding the transfer of assets and funds by the French Government to SNPE in 1970 and subsequent years was not countervailable;

(3) The finding by Commerce that the purchases by SNPE of inputs from suppliers were not countervailable subsidies, based upon the unsupported and unverified assumption that government controlled and subsidized suppliers would not pass along a portion of their subsi-

dies to SNPE which was also government controlled, was unsupported by substantial evidence or otherwise not in accordance with law; and

(4) The reliance by Commerce upon partial and preselected verified information supplied by SNPE or the government of France following the refusal by SNPE or the government of France to supply all the information required by Commerce was contrary to the requirements of section 776 of the Act which requires Commerce to use the best information otherwise available.

The United States defends its determination as follows:

(1) The calculations employed by Commerce of the cross-subsidization of the production of industrial nitrocellulose by the French Government's purchase of military nitrocellulose at excessive prices was reasonable and in accordance with law in light of the best information available;

(2) The formation of SNPE by the transfer of assets by the French Government to SNPE in exchange for stock on terms consistent with commercial considerations did not constitute a subsidy;

(3) The determination by Commerce that the purchase of inputs from government owned companies did not constitute a countervailable benefit to SNPE was supported by substantial evidence on the record and was otherwise in accordance with law; and

(4) Commerce based its final determination upon information that was verified upon the best information otherwise available in conformity with the countervailing duty laws and regulations of the Department of Commerce.

Defendant-intervenor SNPE generally concurs with the contentions of the defendant United States.

### C. Contentions of the Parties in Court No. 83–07–01075

Plaintiff SNPE, the foreign producer, contends the following:

(1) The finding by Commerce that the production of industrial nitrocellulose

was cross-subsidized by military sales is unsupported by substantial evidence on the record and is otherwise not in accordance with law for the following reasons:

A. The theory of cross-subsidization was contrary to the intent of Congress;

B. This theory is also contrary to established and sound administrative practice;

C. Commerce was in error when it found military sales were at premium or excess prices;

D. Commerce was in error in assuming a benefit was conferred on INC where INC operations were assumed to be unprofitable;

E. Commerce adopted the theory of cross-subsidization because of political pressure; and

F. The methodology of Commerce did not represent or adequately estimate the amount of any subsidy.

(2) Commerce's determination that the French law permitting government workers at SNPE to retain government status conferred a countervailable subsidy is unsupported by substantial evidence on the record and is otherwise not in accordance with law;

(3) The finding by Commerce that the funds received from the Ministry of Defense of France to upgrade SNPE's pyrotechnical safety equipment were countervailable is unsupported by substantial evidence on the record and is otherwise not in accordance with law; and

(4) The finding by Commerce that DATAR Regional Assistance was countervailable is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

SNPE, the foreign producer, also challenges the ITC's determination Hercules was materially injured prior to 1982 by reason of French imports. SNPE contends this decision is unsupported by substantial evidence on the record and is otherwise not in accordance with the law.

Defendant United States counters SNPE's arguments as follows:

1. The subsidy conferred upon SNPE by the assumption by the Government of France of certain labor costs for employees with civil service status should not be offset by the higher cost of wages of employees with civil service status. Moreover, the Court should not consider the merits of SNPE's argument since it was not raised at the administrative level;

(2) Commerce correctly determined that the assistance provided to SNPE through DATAR constituted a countervailable subsidy because the benefits were conferred upon a regional basis and were therefore preferential. In any event the Court should not consider the merits of SNPE's argument since it was not raised at the administrative level;

(3) Funds received by SNPE from the French Ministry of Defense for the purchase of pyrotechnical safety equipment constituted a countervailable subsidy; and

(4) The determination by Commerce that the government of France was subsidizing the production of industrial nitrocellulose by paying excessive prices for military nitrocellulose was reasonable and in accordance with law, was based upon the best information available, and was properly calculated. Defendant United States further indicates the administrative record does not support SNPE's allegation Commerce's decision was the result of political pressure.

As to the determination of the ITC, defendant United States argues there is substantial evidence on the record supporting the Commission's determination that the domestic nitrocellulose industry was materially injured.

Defendant-intervenor Hercules contends the determination that the military nitrocellulose sales by SNPE subsidized the production and export of industrial nitrocellulose was supported by substantial evidence on the record and was otherwise in accordance with law. Defendant-intervenor further contends there is substantial evidence on the record of decreased production, shipments, and employment to support the Commission's finding that a domestic industry, *i.e.* Hercules, suffered material in-

jury on account of the imports from France.

## D. Discussion

### 1. Introduction

The Secretary of Commerce has been entrusted with the authority and responsibility for administering the countervailing duty law. In this capacity, the Secretary is vested with broad discretion. *Smith Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The countervailing duty law [3] provides if Commerce finds a foreign government or entity is subsidizing the manufacture, production, or exportation of goods imported into the United States, and where required, the ITC issues an affirmative injury determination, then Commerce must impose countervailing duties on the goods equal to the amount of the subsidy.

█ The Court in reviewing the present action must sustain Commerce's countervailing duty determination unless it finds it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.A. § 1516a(b)(1)(B) (1982). It is also well settled that the administrative agency "has broad discretion in the enforcement of the trade laws and ... [its] 'decision does not depend on the "weight" of the evidence, but rather on [its] expert judgment ... based on the evidence of the record.' " *Manufacturas Industriales de Nogales, S.A. v. United States*, — CIT —, —, 666 F.Supp. 1562 (1987) (quoting *Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984)).

█ The "substantial evidence test" restricts the scope of the Court's review of the agency record. Much deference is given to the agency's interpretation. As long as the interpretation is sufficiently reasonable, it will be upheld. Furthermore, it need not be the only reasonable interpretation. *Atcor, Inc. v. United States*, — CIT —, —, 658 F.Supp. 295, 299 (1987). In arriving at a clear understanding of the meaning of "substantial evidence," it has been recognized:

> 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Substantial evidence 'is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'

*Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir.1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); and quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) respectively).

### 2. Court No. 83-07-00951

█ In challenging Commerce's *Final CVD Determination*, plaintiff Hercules concurs with the determination that SNPE benefited from certain subsidies bestowed by the Government of France (GOF), but disputes other findings of Commerce as not supported by substantial evidence on the record or not otherwise in accordance with law. Hercules first argues that, although Commerce was correct in finding sales of military nitrocellulose subsidized sales of industrial nitrocellulose, nevertheless, Commerce incorrectly calculated the *ad valorem* subsidy amounts. Hercules argues Commerce mischaracterized the subsidy as an equity infusion, rather than a grant. Hercules maintains no stock was issued for this subsidy, and therefore, Commerce should not have treated this subsidy as an equity infusion, but as a grant. Hercules continues:

> Even if the subsidy should be treated as an equity infusion, Commerce's methodology ... is incorrect because (a) [it] is an unjustifiable deviation from Commerce's normal equity meth-

---

**3.** 19 U.S.C. §§ 1671 et seq. (1982).

odology ...; (b) Commerce should have included in its measurement of the equity infusion ... increases in its industrial nitrocellulose net working capital because the subsidy earned on SNPE's sales of military nitrocellulose could be used to acquire other industrial nitrocellulose assets in addition to fixed assets; and (c) Commerce should have assumed a negative, instead of ... zero, rate of return on operations from industrial nitrocellulose....

Plaintiff Hercules' Brief in Support of its Motion for Judgment upon the Administrative Record at 7-8, *Hercules, Inc. v. United States*, Court No. 83-07-00951, Joined Issue Calendar.

Commerce, on the other hand, contends its calculation of the subsidy was reasonable under the circumstances and in accordance with law. Both SNPE and the GOF refused to provide information about the sales of military nitrocellulose or profit and loss figures for the industrial nitrocellulose production to rebut Hercules' allegations concerning cross-subsidization. Commerce argues it had no other alternative but to assume the validity of cross-subsidization and employ an equity methodology utilizing the best information available [4] to calculate the subsidy derived from the GOF's payment of excessive prices for military nitrocellulose.

Commerce compared the company-wide rate of return for SNPE on equity with the rate of return on equity for industrial nitrocellulose. Commerce assumed the rate of return on equity for industrial nitrocellulose was zero as the best information available because SNPE and the GOF refused disclosure of the necessary information to construct this rate. The resultant differential between the companywide rate of return and rate of return for industrial nitrocellulose, which ultimately became the percentage rate of return for the entire company, was then applied to the amount of fixed assets purchased for the industrial nitrocellulose operations. This fixed assets figure, Commerce explains, was chosen as a substitute for equity infusions due to the impossibility Commerce had in determining and allocating the GOF's infusions of equity for the industrial nitrocellulose production. Commerce determined the subsidy rate by applying the formula to fixed assets over a ten-year average useful life period.

The Court does not agree Commerce's decision to use an equity method was not supported by substantial evidence on the record or was not otherwise in accordance with law. The GOF and SNPE provided limited information for Commerce to utilize in formulating a rate of subsidy. The equity methodology was chosen "because cash infusions by means of government purchases of military products at premium or 'excess' prices may, when such prices are paid to a wholly government-owned company, properly be viewed as infusions of equity." 48 Fed.Reg. at 11,973. Commerce asserts the unique facts of this investigation as well as the time constraints and limited information were crucial factors in the decision to choose this method.

Hercules' assertion the cross-subsidy was a grant is without merit. Commerce has explained its view of the difference between an equity purchase and a grant as follows:

4. This rule provides as follows:

 (a) **General Rule.**—Except with respect to information the verification of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition.

 (b) **Determinations to be made on best information available.**—In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e (1982)

The essential difference between an equity purchase and the bestowal of a grant is the potential for return on equity. The domestic interested parties contend that the potential for any return on investment in these companies is mimimal [sic] and therefore the Department should [sic] this difference in its treatment of equity infusions. Their argument focuses on the poor prospects for potential dividends at average rates, while ignoring the potential return in terms of retained earnings or increasing worth tof [sic] the company. Because we cannot discount this potential at the time the infusion is made, we should not treat equity infusions as an outright grant. To do so would raise the possibility of countervailing more than the net subsidy in cases where the government receives a return, in retained earnings or increasing worth from its investment.

. . . .

The treatment of equity infusions as grants ... implies that the government could expect no return, in terms of dividends, retained earnings, or through increased worth, from its investment. We lack the ability to look into the future that would be necessary to make such a judgement [sic]. Because of the difference betwen [sic] equity purchases and grants, the treatment of equity infusions as grants is inappropriate. We believe that our 'rate of return shortfall methodology appropriately measures benefits from equity by an equity-based standard.

*Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,022, (1984). The GOF, owning over 99 percent of the outstanding stock of SNPE could receive potential returns in the form of retained earnings or increased worth of holdings from any profits generated by SNPE from alleged "excess" prices paid. From review of the record and in granting Commerce deference in the administration of the trade law, it is clear substantial evidence on the record supports Commerce's stance.

■ Neither does this Court concur with Hercules that Commerce was incorrect in the way it utilized its equity method in valuing the cross-subsidy. As discussed above, SNPE and the GOF refused to disclose certain information. The facts of the investigation were unique, and Commerce was confronted with constricting time limitations for verification. Commerce explained by letter, dated April 14, 1983, to counsel for Hercules, that it employed its equity method in a manner that "most accurately measures the [subsidy] benefit to the recipient." Record at 3475–76.

■ Hercules also urges Commerce was deficient in considering the amount of the equity infusions to be measured only by the fixed assets purchased by SNPE. Hercules claims "[t]his assumption does not take into account the fact that cash from the GOF *may be used* for other purposes necessary for the production of industrial nitrocelluose." Plaintiff Hercules' Brief in Support of its Motion for Judgment upon the Administrative Record, *supra,* at 18 (emphasis added).

Commerce explains its rationale as follows:

> [We c]hose not to treat the total value of the assets purchased for INC production as the amount of subsidy from military sales, as suggested by Hercules, because in so doing [Commerce] would have grossly over-estimated the amount of the subsidy.... Hercules' suggested methodology assumes that *all* assets purchased for INC operations were paid for with funds from cross-subsidization. This in turn assumes that INC sales were not generating any revenues from which assets could be purchased. However, the assumptions inherent in Hercules' proposed methodology were not borne out by the other information available to [Commerce].

Defendant's Opposition to Plaintiff's Motion for Judgment upon the Agency Record at 18–19, *Hercules, Inc. v. Unit-*

*ed States*, Court No. 83–07–00951, Joined Issue Calendar.

Clearly, it is within Commerce's "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). Similarly, it was within Commerce's reasonable discretion to assume a negative, rather than a zero, rate of return on equity on INC production when determining the cross-subsidization rate. Hercules claims Commerce erred by not considering and adopting the findings of the concurrent antidumping record as the best information available to establish the zero rate determination.

In the concurrent antidumping investigation, Commerce determined:

> For certain grades, we found that sufficient sales of industrial nitrocellulose were made at or above the cost of production and, therefore, those sales were used in making price-to-price comparisons with sales in the U.S. market. For certain other grades of industrial nitrocellulose, we found that sales which were made above the cost of production were inadequate as a basis for the determination of foreign market value....

*Final LTFV Determination*, 48 Fed. Reg. at 21,615–16.

Here, Commerce's determination was based on evidence of below cost sales only in France; not all sales in France were below cost. In contrast, Commerce's determination in the countervailing duty investigation was based on SNPE's worldwide rate of return on INC production. Accordingly, the findings do not conclusively establish the overall rate of return on INC sales in France was negative. At the very least, there is no firm basis to assume the INC loss on French sales would augment a loss on INC overall operations, even if French sales were below cost. Commerce's assumption of a zero return rate as based on the best information otherwise available was a reasonable exercise of the agency's explicit statutory discretion.

Hercules' second major contention with Commerce's countervailing duty determination is that Commerce failed to characterize the GOF's creation of SNPE from SP as a legal fiction, failed to treat the transfer of assets from the one to the other as a countervailable subsidy, and erroneously determined both acts were consistent with commercial considerations. Hercules further complains Commerce failed to examine SP's books and records for proper valuation of the transferred assets.

Commerce's language in the Federal Register responds to this argument:

> The record in this case shows that SNPE was organized in response to binding directive that certain state monopolies be adjusted to operate on a competitive, commercial basis. Indeed we have discovered no evidence that the purpose or intent of the French Government was anything other than the commercialization of SP. Given that government ownership of a business is not a subsidy *per se*, the French Government's decision to fulfill its treaty obligations by 'spinning off' its industrial nitrocellulose operations does not, on its face, constitute subsidization of those operations.
>
> ....
>
> In sum, viewing SNPE's industrial nitrocellulose operations within the context of the whole company, and in the larger context of the special circumstances of the company's creation, there is no evidence to suggest an intent to subsidize industrial production. To the contrary, the evidence we have gathered and verified supports the conclusion the French Government has no purpose other than the fulfillment of its treaty obligation to commercialize SP. Consequently, we conclude the creation of SNPE and the transfer of assets by which it was carried out did not take place on terms inconsistent with commercial consideration [sic] and, therefore did not give rise to countervailable benefits.

*Final CVD Determination*, 48 Fed.Reg. at 11,974.

■ Commerce's determination that the creation of SNPE was not a legal fiction, was consistent with commercial considerations, and did not constitute a countervailable subsidy is supported by substantial evidence on the record. The GOF's creation of SNPE from SP was in keeping with terms of its obligations under the Treaty of Rome, Article 37 [5], which calls for the commercial adjustment of any State monopoly to ensure against unfair trade discrimination among the member states. The GOF retained a majority shareholder status upon receiving value for the equity infusion of assets from SP to SNPE. Thus, the determination of Commerce was reasonable and supported by substantial evidence in the record that SP was transformed into a newly-formed public corporation to operate on a competitive basis consistent with commercial considerations and was not transformed to serve as a legal fiction.

■ Hercules further contends, in the alternative, if the creation of SNPE was not a legal fiction, then SNPE's creation and the GOF's transfer of assets were inconsistent with commercial considerations.

Commerce defends its position by asserting the GOF transferred assets from SP to SNPE in accordance with treaty obligations for creating a newly formed corporation. Commerce verified these assets were properly valued in accordance with generally-accepted accounting principles and commercial law and practice in France. Commerce found these equity infusions were consist-ent with commercial considerations as set forth at § 771(5)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(5)(B)(i) [6] and that the GOF exercised sound government investment policy by investing in a creditworthy company.

When Commerce finds certain transfers of assets provided by a foreign government are infusions of equity, then Commerce, pursuant to § 1677(5)(B)(i) must scrutinize these benefits to determine their consistency with commercial considerations. *See British Steel Corp. v. United States*, 9 CIT 85, 605 F.Supp. 286 (1985). The GOF, in creating SNPE, transferred commercial and industrial assets and operations of SP to SNPE in exchange for over 99 percent of the outstanding stock. 48 Fed.Reg. at 11,974. These equity infusions, by the GOF, were directed into an apparently healthy and sound enterprise, SNPE. Commerce scrutinized the decision of France to commercialize SP into SNPE, the latter of which has apparently maintained a profitable stance since its inception. Commerce summarizes its position as follows:

> Our treatment of government equity investment in a company *hinges essentially on the soundness of the investment.* If the government investment was reasonably sound at the time it was made, we do not consider it a subsidy. *If*, on the contrary, *the investment appears to have been unsound, a subsidy may exist.* Government investment confers a subsidy

---

5. The Treaty of Rome, establishing the European Economic Community (EEC), requires its member states adhere to the following:

> [A]djust any State monopolies of a commercial character so as to ensure that ... no discrimination regarding the conditions under which goods are procured and marketed exists between nationals of Member States.
>
> The provisions of this Article shall apply to any body through which a Member State, in law or in fact, either directly or indirectly supervises, determines or appreciably influences imports or exports between Member States. These provisions shall likewise apply to monopolies delegated by the State to others.

The Treaty of Rome, Article 37, paragraph 1, March 25, 1957, 298 U.N.T.S. 11.

6. This subsection provides as follows:

(5) **Subsidy.**—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

. . . .

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

19 U.S.C.A. § 1677(5)(B)(i) (1982).

only when it is on terms inconsistent with commercial considerations.

An equity subsidy potentially arises when the government makes equity infusions into a company which is sustaining deep or significant continuing losses and for which there does not appear to be any reasonable indication of a rapid recovery.

*British Steel Corp.*, 9 CIT at 92, 605 F.Supp. at 291 (1985) (citing *Final Affirmative Countervailing Duty Determinations on Stainless Steel Sheet, Strip, and Plate From the United Kingdom*, 48 Fed.Reg. 19,048, 19,049 (1983) (emphasis added).

In the context of a government investment in a company sustaining deep or significant continuing losses, the equity infusion will be considered at the time of the government's investment. The important criterion to be considered is the *soundness* of the investment. In a situation where a new entity is created, there is no past record of a company's creditworthiness to examine. The crucial issue is whether or not the investment appears to be sound. Here, Commerce observed there was no "track record" of SP, the predecessor of SNPE, and no profit-and-loss statement to examine. Consequently, Commerce in light of the best information available examined the overall financial health of SNPE and its INC operations and found the GOF's creation of and investment in SNPE was a sound investment in a creditworthy company. Commerce explains its procedures as follows:

> To be "equityworthy," a company must show ability to generate a reasonable rate of return within a reasonable period of time. In making our equityworthiness determinations, we assess a company's current and past financial health, as reflected in various financial indicators taken from its financial statements, and where appropriate, internal accounts. We give great weight to the company's recent rate of return on equity as an indication of financial health and prospects. Like our creditworthiness test, our equityworthiness analysis also takes into

account the company's prospects as reflected in market studies, country and industry forecasts, and project and loan appraisals, when these types of analyses are available.

*Cold-Rolled Carbon Steel Flat-Rolled Products From Argentina*, 49 Fed.Reg. at 18,020.

There is substantial evidence in the record to support the finding by Commerce that the GOF's decision to create and invest equity in SNPE was consistent with commercial considerations. The discretionary power to make such a determination is vested in Commerce; this Court will not supplant its own expertise for that which is exercised by the agency.

Hercules' third area of dissatisfaction concerns Commerce's determination that SNPE's purchases of inputs from government-owned companies are not countervailable subsidies. Hercules also claims Commerce's manner of verification was deficient because Commerce did not conduct a thorough comparison of prices set by SNPE's input suppliers. These input suppliers were government-owned purveyors of electric power, gas, nitric acid, and oleum. Hercules contends subsidies are conferred upon SNPE when it purchases these inputs.

Commerce responds as follows:

> [the sale] of natural gas and electricity did not confer subsidies upon SNPE because [Commerce] had verified that the utility rates charged to SNPE were based upon a standard pricing formula which is applicable to all industrial users in the area of SNPE's nitrocellulose production facility. [Commerce] determined that there were no subsidies with respect to purchases of oleum or nitric acid because SNPE's suppliers of these commodities were privately owned and controlled during the period of investigation, and there was no evidence that the volume discounts obtained by SNPE were unduly favorable when compared with prices charged to other large volume buyers of these inputs.

Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record, *supra,* at 3–4.

In its final determination, Commerce discussed the oleum and nitric acid purchases as follows:

> With respect to SNPE's purchases of oleum and nitric acid, we have verified that while the suppliers of these inputs are now owned by the government of France, during the period of investigation these companies were privately owned and controlled. Any countervailable benefits flowing to the company which occur outside the period for which we are measuring subsidization would be included in an annual review following any issuance of a countervailing duty order in this investigation.

*Final CVD Determination,* 48 Fed.Reg. at 11,975.

Nevertheless, Commerce performed a verification of these purchases by checking the documents presented setting forth the prices before and after nationalization and determined there were no changes to signify a subsidy.

■ Concerning the purchase of natural gas and electricity, Commerce employed an "arm's-length test" in its verification of the alleged subsidies from input suppliers. This arm's-length test is explained by Commerce, as follows:

> Benefits bestowed upon the manufacturer of an input do not flow down to the purchaser of that input, if the sale is transacted at arm's-length. In an arm's-length transaction the seller generally attempts to maximize its total revenue by charging as high a price and selling as large a volume as the market will bear....
>
> ....
>
> Where a subsidized coal producer and a steel producer are related companies, it is reasonable to question whether, in fact, the transfer price for coking coal is established on an arm's-length basis. In general, our tests for whether the prices for coking coal *charged to a related company* were established on an arm's-length basis

include: (1) Whether the coal producer sold to its related steel producers at the prevailing price, and/or (2) whether the coal producers sold to its related steel producers and all other purchasers of coking coal at the same price.

*Final Affirmative Countervailing Duty Determinations; Certain Steel Products From Belgium,* 47 Fed.Reg. 39,304, 39,308, 39,324 (1982).

Hercules argues Commerce should have employed a different method of verification in this instance. Hercules urges a "comparison of prices" methodology should have been utilized.

The decision to select a particular methodology rests solely within Commerce's sound discretion. As long as there is "substantial evidence on the record" to support the choice, the Court will sustain the methodology chosen by Commerce. Thus, while Hercules proposes the Court choose an alternative method for verification, "[this C]ourt may not substitute its judgment for that of [Commerce] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....*'" *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22 (1st Cir.1983), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).

Hercules further urges Commerce did not adequately verify the information submitted by SNPE establishing arm's-length transactions for the input purchases. The Court does not agree. When Commerce applies a reasonable standard to verify materials submitted and the verification is supported by such "relevant evidence as a reasonable mind might accept," the Court will not impose its own standard, superceding that of Commerce. *See Agrexco, Agricultural Export, Co., Ltd. v. United States,* 9 CIT 40, 47, 604 F.Supp. 1238, 1244 (1985). Commerce verified the utility rates charged to SNPE were based on standard pricing with respect to all industries in the region who use the utilities. Commerce did

not find preferential pricing was afforded SNPE from the government-owned utility companies. Commerce examined the documents and other pertinent data submitted and concluded that SNPE's purchases were at arm's-length.

Hercules contends that Commerce erroneously interpreted and applied the "best information otherwise available" standard. According to Hercules, since the GOF and SNPE failed to provide pertinent or otherwise provided incomplete data, Commerce should have employed the "best information otherwise available." Furthermore, Hercules argues, Commerce should have drawn negative inferences from the failure to provide the data. Hercules challenges Commerce's action as contravening the language and intent of Section 776 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677e.[7] Hercules concludes by asking the Court to order Commerce to draw adverse inferences from the GOF's refusal to supply complete information.

Commerce defends its verification procedure, maintaining it relied upon verified information. Where information was not verifiable, Commerce relied upon the "best information otherwise available," in conformity with the statute and regulations. Commerce argues it employed the usual verification procedure which included inspecting documents, SNPE's plant, operations, and records, and performing interviews. Commerce verified the information supplied by SNPE and the GOF in the questionnaires. As to the four alleged areas of unverified information, Commerce urges it received and verified sufficient information to properly make its determination. Commerce contends the agency need not verify all information it receives. Rather, according to Commerce, only that

information relied upon in making a determination must be verified.

▇▇▇ When the agency is alleged to have included or excluded certain information from a determination, it is the Court's function, on review, in accordance with the "best information otherwise available" rule, to determine whether or not the inclusion or exclusion of such information distorts or detracts from the evidence. The distortion or detraction must render the evidence on the record insubstantial to support the agency's determination. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.Cir.1984). This test emanates from the "substantial evidence on the record" standard which requires such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

▇▇▇ In accordance with the above language, the Court finds the information Hercules alleges was not supplied or not verified and used by Commerce has not been established as such information that would so detract from or distort the evidence as to render the evidence on the record insubstantial to support Commerce's determination. Section 1677e establishes the administering agency must verify all the information it relies upon for its determination. Commerce was not required to use or verify all information it received from SNPE and the GOF. It is enough for Commerce to receive and verify sufficient information to reasonably and properly make its determination.

It appears the GOF submitted incomplete information and refused to submit other requested information. The GOF relied upon Article XXI of the General Agreement on Trade and Tariffs (GATT), which authorizes the nondisclosure of information for reasons of national security.[8] This ap-

---

7. *See supra* note 4.

8. Commerce's explanation of the significance of this invocation by the GOF is set forth as follows:

 Under Article XXI of the GATT, any contracting party has the right to refuse disclosure of information where it considers such disclosure contrary to its security interests. In our view, while national security considerations

cannot serve as a blanket excuse for non-cooperation, nor for non-compliance with our countervailing duty and antidumping laws, the legitimate national security interests of a respondent government must be taken into account in any decision regarding what constitutes best information available. Where access to information deemed relevant to an investigation is barred by legitimate claims of national security, resort to [sic] "best informa-

plication of Article XXI to justify nondisclosure appears not to be incorporated in Section 771 of the Trade Act. Nevertheless, the Court finds, upon review of the record, that despite Commerce's failure to obtain and verify the omitted information, it is clear there is substantial evidence on the record to support Commerce's determination. It is also clear that no distortion or detraction from the record occurred which would warrant the Court to remand the determination to Commerce.

In conclusion, the Court borrows from the language of the United States Court of Appeals for the Federal Circuit, which has aptly stated:

> [C]onsidering ... the entire record ... [this Court] cannot find that [there is] so little evidence on the record as to be less than a "mere scintilla" or less than that which "a reasonable mind might accept as adequate to support a conclusion." To the contrary, [this Court] find[s] that [Commerce's] determination ... is quite reasonable and supported by substantial evidence on the record. Considering the compromise which [Commerce] must make between a perfectly accurate and an extremely rapid determination under this complex statute, [Commerce's "errors" of which Hercules complains, "if they do so exist" are] not so debilitating as to render the final determination unsupported under the substantial evidence standard. *Atlantic Sugar, Ltd.,* 744 F.2d at 1563.

### 3. Court No. 83–07–01075

By a Rule 56.1 motion, plaintiff Societe Nationale des Poudres et Explosifs (SNPE), challenges the countervailing duty order, the underlying affirmative countervailing duty determination, and the ITC's injury determination. SNPE claims Commerce's determination that INC production was cross-subsidized by military nitrocellulose sales is not supported by substantial evidence on the record and is otherwise not

in accordance with law. Specifically, SNPE argues Commerce's theory of cross-subsidization, adopted in response to political pressure, is both contrary to the intent of Congress and to established and sound administrative practice. SNPE contends the finding military sales were made at "premium or excess" prices was unsubstantiated by any evidence on the record. Furthermore, SNPE claims Commerce's assumption INC production was unprofitable does not establish INC operations received a benefit. SNPE also urges Commerce's methodology erroneously represented the estimated amount of any subsidy that may have existed. Defendant United States opposes these arguments contending its findings and methodology were reasonable, in accordance with law, and should be sustained.

■ With respect to the validity of Commerce's cross-subsidization methodology, there is no indication this methodology violates the intent of Congress or is contrary to sound administrative practice. The countervailing duty law provides for the levy and payment of duties equal to the net amount of subsidies. Countervailing duties must be determined and imposed by the administering agency in accordance with subtitle IV of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671–1677g. The administering agency has statutory authority to use the best information otherwise available when a party involved in the determination process refuses or is unable to produce requested information in the format or timely fashion required. 19 U.S.C. § 1677e(b). Nothing within the statutory framework leads the Court to conclude Commerce's application of the law is not sufficiently reasonable. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

Commerce investigated the possibility of cross-subsidization because Hercules contended that earnings from sales of military nitrocellulose were transferred for the pur-

---

tion available" supporting the most adverse assumptions or results would give every appearance of punishing the respondent for its invocation of a right recognized by the GATT

and by general principles of international law and sovereignty.
*Final CVD Determination,* 48 Fed.Reg. at 11972, fn. 1.

pose of asset purchases for INC production. SNPE and the GOF refused to supply Commerce with pertinent information to verify the independent profitability of INC production. Consequently, Commerce adopted the following position: "[i]n view of respondent's refusal to furnish the information required to prove or disprove the petitioner's allegation that military sales are used to provide a subsidized basis for industrial nitrocellulose, we must assume its validity." *Final CVD Determination*, 48 Fed.Reg. at 11,972.

When requested information is not disclosed upon request, § 1677e(b) directs Commerce to use the best information otherwise available. In this case the best information otherwise available was verifiable information Hercules provided as well as other information gathered from SNPE. Commerce calculated the subsidy by utilizing a method suited for the situation and the information available. An equity based methodology was employed to provide the proper analogous representation of the cross-subsidization received by SNPE in the production of INC from the military nitrocellulose sales. It appears this methodology most accurately measured the benefit to INC operations.

Commerce's formulation of the equity methodology involved the following three elements: "(1) The respondent's company-wide rate of return on equity, (2) the rate of return achieved on industrial nitrocellulose, which was compared against the respondent's company-wide rate of return on equity, and (3) the results of these comparisons applied against purchases of fixed assets associated with industrial nitrocellulose production." *Final CVD Determination*, 48 Fed.Reg. at 11,973. The rate of return achieved from INC was assumed at

a rate of zero, pursuant to the best information otherwise available rule, because SNPE was unable to cooperate in providing relevant information. Fixed asset purchases were also used because of SNPE's inability to provide pertinent data for the calculations. SNPE was unable to provide any verifiable, relevant information to assist Commerce in determining otherwise.

Commerce's cross-subsidization methodology decisions were reasonable and supported by substantial evidence on the record. In light of all the circumstances and specifically the refusal by SNPE to supply information and the facts on the record, the Court finds Commerce was justified in countervailing the subsidy provided by the earnings of military sales diverted to benefit INC production. Contrary to the argument of SNPE, that Commerce countervailed INC production upon a a suspicion of a subsidy and utilized erroneous methodology calculations and assumptions, the Court finds Commerce did not make unreasonable or unsubstantiated assumptions or erroneous calculations of the subsidy to justify the Court substituting its judgment for that of Commerce. *American Spring Wire Corp. v. United States*, 8 CIT 20, 590 F.Supp. 1273 (1984), *aff'd sub nom., Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985). The Court finds there is insubstantial evidence on the record Commerce bowed to political pressure in its determination. Commerce employed a reasonable methodology and considered all factors including asset purchases, rates of return, and INC operations. In short, Commerce's conclusions regarding cross-subsidization were based on substantial evidence in the record.

SNPE also challenges Commerce's finding a certain French law [9] conferred labor-

9. Commerce's determination explains this law and its significance:

C. *Assumption of Labor Costs.* When SNPE was incorporated, all military and civilian personnel of its predecessor, Service des Poudres (SP), were placed at the disposal of the president of SNPE, as authorized by Article 5 of Law No. 575 dated July 5, 1970. After a period of one year, those employees had the option of either: (a) Being placed again at the disposal of the Minister of National Defense;

or (b) being recruited by SNPE in accordance with the provisions of the labor laws. Employees with government civil service status who remained with SNPE had the option of retaining this status. Original employees of SNPE who elected to retain civil service status would continue to be subject to the terms and conditions applicable to government employees in any facility which fell under the jurisdiction of the Minister of National Defense. According to the 1982 Report of the Govern-

related countervailable subsidies. SNPE contends this finding is unsupported by substantial evidence on the record and is otherwise not in accordance with law. Commerce found GOF assumptions of certain civil-status labor costs conferred countervailable subsidies upon SNPE. SNPE argues although the GOF assumed these costs for civil status employees of SNPE, the overall amount of the benefit was offset by the higher government wage level at which SNPE had to pay those civil status employees. SNPE therefore urges there was no competitive benefit to countervail under 19 U.S.C. § 1677(5). Commerce contends there is no allowance for such an offset under 19 U.S.C. § 1677(5)(B)(iv), but regardless, Commerce continues, SNPE did not raise this argument on the record of the administrative review which is before the present Court and, therefore, is barred from doing so now.

▮ Commerce specifically argues SNPE did not make the argument the assumption of labor costs should be offset by the higher salaries of civil service workers in *any* of its comments in the administrative record. Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record at 13, *Societe Nationale des Poudres et Explosifs v. United States*, Court No. 83–07–01075, Joined Issue Calendar (emphasis added). SNPE agrees with Commerce that SNPE did not raise the argument in its pre-hearing, hearing, and post-hearing statements. SNPE urges these statements were addressed to the issues raised in Commerce's preliminary determination which found that there was no labor subsidy. Thus, SNPE had no reason to believe that Commerce would reach a different conclusion than it had in the preliminary determination. SNPE was not notified of Commerce's changed position until the final determination. Plaintiff's Brief in

Reply to Defendant's and Intervenor's Responses in Opposition to Plaintiff's Motion for Judgment Upon the Agencies' Records at 32–33, *Societe Nationale des Poudres et Explosifs v. United States*, Court No. 83–07–01075, Joined Issue Calendar.

Regardless of SNPE's reasons for not making this argument during the hearing, the Court is more concerned with SNPE's allegation that the argument was raised during verification. The record contains a letter from SNPE to Commerce. Record at 2711–13. This letter responds to questions Commerce submitted to SNPE on the comparison of the cost to SNPE of "workers under status" and "private workers." SNPE argues in this letter the total cost of workers under civil status was higher than the cost of private workers and admits it does not pay "social expenses" for workers under civil status. The letter ends as follows: "[t]he difference is therefore.... for people being employed in the manufacture of INC. One must remember, however, that this 'saving of social costs' is offset by higher wages. SNPE has therefore not benefitted [sic] by employing workers under status. Instead, the contrary is true." Record at 2713 (confidential information omitted).

Although the Court is not at liberty to make *de novo* determinations, but only review the determinations on the basis of the administrative record pursuant to 19 U.S.C. § 1516a, the above language of the letter in the record clearly stands in contradiction to Commerce's argument SNPE never raised the argument in the administrative proceedings. Accordingly, the Court will entertain this claim.

▮ Section 771(5)(B)(iv) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(5)(B)(iv) establishes a countervailable subsidy includes the assumption of pro-

ment of France's Auditor General's Office, there are still a number of workers with government status employed at SNPE. All new employees hired since the establishment of SNPE have no option to choose civil service status.

Petitioner alleges SNPE is relieved of the payment of certain wage costs because a portion of its workforce retains government sta-

tus. We have verified that, while SNPE is responsible for the payment of the wages for all its employees (status and non-status), it is relieved of the payment of certain benefit costs (unemployment, pension, and health insurance premiums) for those workers retaining government status.

*Final CVD Determination*, 48 Fed.Reg. at 11973.

duction costs. Section 1677(5)(B)(iv) provides in pertinent part as follows:

> (5) **Subsidy.**—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:
>
> ....
>
> (B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:
>
> ....
>
> (iv) The assumption of any costs or expenses of manufacture, production, or distribution.

19 U.S.C.A. § 1677(5)(B)(iv) (1982).

Offset allowances in the calculation of a net subsidy are comprised within § 1677(6), which provides as follows:

> (6) **Net Subsidy.**—For the purpose of determining the net subsidy, the administering authority may subtract from the gross subsidy the amount of—
>
> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy,
>
> (B) any loss in the value of the subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
>
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

19 U.S.C.A. § 1677(6) (1982).

It is clear SNPE was relieved of the costs of certain wage benefits (pension, unemployment, and health insurance premiums) constituting expenses of the production of INC. These benefits constitute subsidies as set forth in § 1677(5)(B)(iv). It is also apparent the offset of higher wages, which SNPE claims should be applied in the net subsidy calculation, does not fit into any enumerated exception set forth at § 1677(6). No application fee, deposit, or similar payment was made which would warrant an offset in the computation of the net subsidy. SNPE pays its employees on a determined pay scale and the GOF pays the work related benefits to those employees retaining civil status. SNPE does not exist as a conduit of benefits transferred from the GOF to SNPE's workers, thereby justifying an offset. Commerce's determination that labor-related subsidies were countervailable is therefore sustained.

■ SNPE's third dispute with Commerce's determination concerns the treatment of certain grants received by SNPE from the GOF to modernize the pyrotechnical safety works of SNPE's plant at Bergerac. SNPE contends Commerce's determination that these funds were a countervailable subsidy was unsupported by substantial evidence on the record and is otherwise not in accordance with law. SNPE claims this GOF grant by the Ministry of Defense was bestowed at the time of SNPE's incorporation and was partial consideration for the GOF's transfer of assets for equity. This is evident, argues SNPE, in the valuation performed by the auditors on assets completed during SP's restructuring. Valuation was based on the assumption that modernization of the pyrotechnical safety works would occur.

Commerce contends the record clearly shows the money given by the GOF to SNPE for the purchase of pyrotechnical equipment was a monetary grant given to a single corporation with no expectation of return on equity. This monetary grant was unlike the separate "equity for assets" swap the GOF made with SNPE in the restructuring of SP. Commerce argues that although the creation of SNPE and the decision to bestow the grant on SNPE occurred at the same time, this fact, in and of itself, does not establish the grant was reimbursement for the original restructuring agreement and asset transfer between the GOF and SNPE. Commerce asserts the grant was taxed by the GOF as income to SNPE.

Substantiation for SNPE's argument includes a reference to Commerce's verification report of March 11, 1983. This report alludes to the valuation process undertaken by the auditors in France and includes the following:

> We questioned Mr. Benichou about the program to upgrade security installations at the SNPE facilities. When the government decided to create SNPE, the Economics Ministry, in conjunction with accounting and engineering experts, valuated all assets which were to be exchanged for equity. The auditors certified that the value of the assets had appreciated and made it known that they had reservations about the security installations at the facilities. They let it be known that the company would face great liabilities in case of an accident and therefore, would not certify the valuations without the government's commitment to undertake the necessary improvements. The government accepted those recommendations and agreed to undertake the improvements at the time of SNPE's incorporation.

Plaintiff's Brief in Reply to Defendant's and Intervenor's Responses in Opposition to Plaintiff's Motion for Judgment Upon the Agencies' Records, *supra*, at 39 (quoting the record at 2909) (emphasis deleted).

It is clear from the record the grant for modernization was not tied in to the original bargained for agreement and transfer of assets for equity but existed as an independent countervailable subsidy. 19 U.S.C. § 1677(5)(B)(i). It appears the auditors did not value the assets to include the yet-to-be obtained modernization grants. They merely refused to certify their valuation until there were assurances that improved security measures were taken to prevent substantial loss from accidents. There is further support for this position as evidenced by the GOF's treatment of this grant as income for the purposes of taxation. Although Commerce determined the underlying restructuring and asset transfer involved with the creation of SNPE was not a subsidy, it does not necessarily follow

that all other ancillary activities surrounding that event are not countervailable. Each program and alleged subsidized activity must be examined on an independent basis. Commerce's determination is sustained.

SNPE's last complaint concerns Commerce's determination certain GOF tax and non-tax regional incentive programs constituted countervailable domestic subsidies. As applicable to this case, SNPE contends the language in 19 U.S.C. § 1677(5)(B), which defines a subsidy as that which is provided to a "group of enterprises or industries" is ambiguous and does not include regional preferences. According to SNPE, such an interpretation would conflict with the GATT, which gave rise to the current countervailing duty law. SNPE alludes to Article 11 of the Agreement on Interpretation and Application of Articles VI, XVI, and XXII of the GATT. This section deals with subsidies and countervailing duty measures. It provides, in pertinent part, as follows:

> Article 11.—*Subsidies other than export subsidies.*
> 1. Signatories recognize that subsidies other than export subsidies are widely used as important instruments for the promotion of social and economic policy objectives and do not intend to restrict the right of signatories to use such subsidies to achieve these and other important policy objectives, which they consider desirable. Signatories note that among such objectives are:
> a) the elimination of industrial, economic and social disadvantages of specific regions. . . .

Agreement on Interpretation and Application of Articles VI, XVI, and XXII of the General Agreement on Tariffs and Trade, April 12, 1979, part I, article 11, 31 UST 532, TIAS No. 9619.

SNPE asserts that because the definition of subsidy in the statute is unclear with respect to regional programs, there is no authority for countervailing such programs. Therefore, continues SNPE, Article 11 of the GATT controls and prohibits

the countervailing of regional GOF tax and non-tax incentive programs.

Commerce challenges the procedural merit of SNPE's GATT argument as not having been raised at the administrative level. Commerce argues "although SNPE did on several occasions during the administrative proceedings contend that the amount of the subsidies received . . . should be calculated differently . . . SNPE never argued that the countervailing of domestic subsidies was prohibited by GATT." Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record, *supra*, at 19. SNPE argues its reference to GATT is presented only as an aid in construing 19 U.S.C. § 1677(5)(B).

 A litigant must exhaust administrative remedies before it may raise a claim in a civil action. However, where a new claim is asserted outside of the administrative record by a party who participated in the administrative proceeding, and the claim is purely legal and does not add factual data to the record, it is within the Court's discretion to consider the claim. The Court must bear in mind any prejudice to the parties which would result from the failure to raise the issue in the proceedings below. *Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 136, 583 F.Supp. 607, 611 (1984).

SNPE's GATT argument arises out of its challenge to Commerce's interpretation of "subsidy" under § 1677(5)(B). This is the controlling legal claim at issue, a claim which SNPE clearly raised in its challenge below. Observing no prejudice to the defendant, the Court finds it is within its discretion to entertain SNPE's argument.

Commerce also opposes the substantive merit of SNPE's contentions and urges 19 U.S.C. § 1677(5)(B) clearly provides domestic subsidies are countervailable if provided by government action to a specific enterprise or industry, or group of enterprises or industries. According to Commerce, this definition would include the regional preferential program at issue. Commerce supports its argument with references to a number of countervailing duty determinations and case law. SNPE, although distinguishing some of the cases, has provided no support for its proposition.

 It is clear from the case law, the term "subsidy" has been interpreted to include regional preference programs as countervailable subsidies. *See United States Steel Corp. v. United States*, 5 CIT 245, 254, 566 F.Supp. 1529, 1537 (1983); *see also ASG Industries, Inc. v. United States*, 67 CCPA 11, C.A.D. 1237, 610 F.2d 770 (1979); *Carlisle Tire and Rubber Co. v. United States*, 5 CIT 229, 233, 564 F.Supp. 834, 838 (1983); *ASG Industries, Inc. v. United States*, 85 Cust.Ct. 10, C.D. 4863, 495 F.Supp. 904 (1980); *ASG Industries, Inc. v. United States*, 82 Cust.Ct. 101, C.D. 4794, 467 F.Supp. 1200 (1979).

Section 1677(5)(B) sets forth examples of government practices identified as domestic subsidies. It is clear Congress painted this definitional section with a broad stroke when it provided in the opening paragraph of (5) that the examples listed under the meaning of "subsidy" were not exhaustive. Section 1677(5)(B) provides in pertinent part:

> **(5) Subsidy.**—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and *includes, but is not limited to*, the following:
>
> . . . .
>
> (B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, *or group of enterprises or industries*, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise. . . .

19 U.S.C.A. § 1677(5)(B) (1982) (emphasis added).

The statute, case law, and prior countervailing duty determinations by Commerce clearly support the reasonableness and lawfulness of Commerce's determination that the regional incentive programs are countervailable subsidies. Commerce's final countervailing duty determination explained the rationale as follows:

D. *Regional Development Incentives.* The government of France provides a series of tax and non-tax regional incentives to French and foreign businesses to establish new, or to expand existing businesses in certain French regions selected as those in which to promote additional development. The Delegation a l'Amenagement du Territoire et l'Action Regionale (DATAR) coordinates the programs of various government agencies and ministries. The Department has verified that, for incentive purposes, France is divided into several zones. Each zone, or part of a zone, is eligible for different types and levels of assistance. The assistance includes development grants, non-industrial grants, research and development grants, decentralization indemnities, and job training subsidies. Since the availability, kind and extent of benefits received under these programs are based upon regional preferences, we determine assistance provided through DATAR constitutes subsidies within the meaning of the Act.

SNPE reported the receipt of a grant in 1979, designated for the Bergerac plant, for the purpose of improving production facilities and general infrastructure. Using the Department's usual methodology for grants, we calculated an *ad valorem* benefit of 0.052 percent.

*Final CVD Determination,* 48 Fed.Reg. at 11,973.

The DATAR grants were specifically designated for "enterprises or industries" grouped according to regions in France. Section 1677(5)(B) provides the term "subsidy" includes those subsidies provided by a government to a group of enterprises or industries. The case law set forth above clearly includes regional preference programs as countervailable subsidies. Therefore, in light of the case law and § 1677(5)(B), Commerce's determination that the DATAR regional incentive programs were countervailable subsidies was reasonable. Furthermore, Article 11 of the GATT does not control the resolution of

this issue. The Court need not utilize GATT for interpretative purposes. The countervailing duty law authorizes Commerce to countervail subsidies as set forth in § 1677(5)(B). *See British Steel Corp. v. United States,* 9 CIT 85, 605 F.Supp. 286 (1985). Commerce's determination was substantiated by the record and was otherwise in accordance with law.

SNPE, in this action, also challenges the ITC's injury determination as set forth in *Nitrocellulose From France,* 48 Fed.Reg. 27,453 (1983). Specifically, SNPE, in its motion for judgment upon the agency record claims the finding by the majority of the Commissioners that Hercules was materially injured by reason of French imports of INC, prior to 1982, is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

The ITC defends its position alleging it made its affirmative determination after evaluating all relevant economic factors bearing on the state of the industry. According to the ITC, it reasonably concluded a domestic INC industry was materially injured. The ITC also defends its determination that subsidized imports of INC from France were the cause of the above-determined material injury. The ITC claims its affirmative determination was in accordance with law since it was based on the criteria to be considered under section 771(B)–(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(7)(B)–(C) and the best information available.

In final countervailing duty investigations, the ITC is charged with the responsibility of determining whether:

> (A) an industry in the United States—
>
> (i) is materially injured, or
>
> (ii) is threatened with material injury, or
>
> (B) the establishment of any industry in the United States is materially retarded,

by reason of imports of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1) of this

section [dealing with final determinations by Commerce].

19 U.S.C.A. § 1673d(b)(1) (1982). If the ITC finds there is present injury (or threat to or retardation of the establishment of an industry) and finds this material injury is by reason of the imports under investigation, then the ITC must make an affirmative finding in the investigation. "Material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C.A. § 1677(7)(A) (1982).

Congress has provided the ITC with a set of guidelines to employ in its consideration and determination of material injury involving countervailable subsidies. The guidelines are set forth in a manner which allows the ITC flexibility in its deliberations; the guidelines are illustrative but not exhaustive. *American Spring Wire Corp. v. United States*, 8 CIT 20, 23, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed. Cir.1985). These guidelines are set forth, in pertinent part, as follows:

**(B) Volume and consequent impact.** —In making its determinations ... the Commission shall consider, among other factors—

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

**(C) Evaluation of volume and of price effects.**—For purposes of subparagraph (B)—

(i) **Volume.**—In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) **Price.**—In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) **Impact on affected industry.**— In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

. . . .

**(E) Special rules.**—For purposes of this paragraph—

. . . .

(ii) **Standard for determination.**— The presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) or (D) shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury.

19 U.S.C.A. § 1677(7)(B)–(C), (E) (1982). The ITC has discretionary authority to weigh and assign significance to any of these factors. *American Spring Wire*, 8 CIT at 23, 590 F.Supp. at 1277. When the Court reviews the injury determination of the ITC, it "may not weigh the evidence concerning specific factual findings, nor may the Court substitute its judgment for that of the Commission." *Id.* at 22, 590 F.Supp. at 1276 (quoting *Sprague Electric*

*Co. v. United States,* 2 CIT 302, 310–11, 529 F.Supp. 676, 682–83 (1981) (footnote omitted)).

SNPE claims the ITC's determination Hercules was materially injured was erroneous. SNPE argues the record does not support an affirmative injury determination for the years 1979–1981. Prior to 1982, SNPE continues, Hercules' profitability was strong, with slight declines in 1980 and 1981. These levels of decline were not sufficient enough to constitute material injury. Citing *American Spring Wire,* SNPE urges a lack of profitability, *per se,* does not constitute material injury. Lack of profitability must be sufficient to outweigh the other factors under consideration to sustain the ITC's determination. SNPE also points to specific statistics in the record to show insufficient support for the ITC's determination.

The ITC, on the other hand, contends plaintiff's views if supported by the evidence constitute an optional view of the facts. This optional view does not constitute a basis for establishing the determination was erroneous. The ITC points to specific factors in the record that substantiate its determination was in accordance with the statutory factors to be considered. According to the ITC, the record reveals Hercules' total INC production as well as its capacity utilization rate declined between 1979 and 1982. Although Hercules expanded its production capacity during this timeframe, the ITC determined the capacity expansion was reasonably made in a market where the demand for INC did not shrink significantly. Hercules' expansion was based on customer demand and reasonable business estimates of the market and capacity utilization. According to the ITC, the record reasonably reveals the increases in capacity did not substantially account for the harm experienced by Hercules. Domestic shipments and profit trends declined from 1979 to 1982, with slight increases in 1980 and 1981. The ITC contends employment figures also support the ITC's determination. In short, in the ITC's view, the record shows a domestic industry was materially injured.

 SNPE also claims the ITC should not have chosen the 1979–1982 period as the relevant timeframe for the countervailing duty investigation. In SNPE's view, the ITC should have investigated only through 1981. The Court holds, however, this choice is within the discretion of the administering agency. *See American Spring Wire,* 8 CIT at 26, 590 F.Supp. at 1279; *British Steel Corp. v. United States,* 8 CIT 86, 593 F.Supp. 405 (1984).

 Although the record does not indicate Hercules experienced a dramatic and critical economic injury, such a level of injury need not be established to support the ITC's determination. Section 1677(7)(A) provides that the harm must reach a level above inconsequential, immaterial, or unimportant. In addition, when the Court is confronted with two opposing, but substantiated views of the record, it is not the ambit of the Court to choose the view which it would have chosen in a trial *de novo.* Rather, the Court must sustain the administering agency's view if it is supported by substantial evidence on the record and in accordance with law. *See American Spring Wire,* 8 CIT 20, 590 F.Supp. 1273. The ITC did not rely solely on a probability factor to determine material injury was sustained by a domestic industry. As discussed above, the ITC considered other factors and made a determination substantiated by the record and otherwise in accordance with law.

SNPE alleges the ITC was incorrect in finding Hercules was materially injured by reason of French imports of INC. Although SNPE admits the legislative history of the countervailing duty law [10] "suggests" the effects of subsidized imports need not be weighed against effects of alternative causes of material injury, SNPE urges the ITC did not verify that the subsidized imports by SNPE were the cause of material injury. Specifically, SNPE charges the imports from France had no more than a *de minimus* effect on the

---

**10.** S.Rep. No. 249, 96 Cong., 1st Sess. 57 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979), U.S.Code Cong. & Admin.News 1979 p. 381.

domestic industry; and in fact, the injury sustained by Hercules was caused by excess capacity, a decline in the market demand for INC, and excessive increases in internal production costs.

The ITC defends its position by referring to the statute [11] which requires material injury be "by reason of" subsidized imports. The ITC contends it is only required to determine if the subsidized imports were a cause of the material injury; the ITC need not weigh the effects of all possible factors of injury. *Id.* The ITC claims its determination should be sustained because the record substantiates its findings which were derived from careful adherence to the statutory criteria as set forth at 19 U.S.C. § 1677(7).

Section 1677(7) directs the ITC to consider, among other factors, the volume of imports, the effect of these imports on domestic prices, and the impact of the imports on domestic producers of like products. 19 U.S.C. § 1677(7)(B). In making determinations under § 1677(7)(B), the ITC is further guided by § 1677(7)(C) which sets forth the criteria to apply in analyzing volume, price, and impact on the affected industry. In accordance with these statutory criteria, the Court holds the ITC's determination is in accordance with law and substantiated by the evidence on the record.

Section 1677(7)(C)(i) establishes the ITC "shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C.A. § 1677(7)(C)(i) (1982). In the instant case, the ITC collected and analyzed data on the absolute volume of imports of INC from France and evaluated this volume in relation to its captive share of the U.S. market. The ITC observed imports increased in volume and captured a share of the declining U.S. market during 1979–1982. It was established domestic sales declined as French imports increased in a relatively stable market during the period covered by the investigation. Commerce made a determi-

nation substantiated by the record that increasing French imports were displacing Hercules' sales in the U.S. market. These findings established a significance in relation to the volume or increased volume of imports under § 1677(7)(C)(i).

Price is also a factor to be considered by the ITC in its material injury determination. The ITC is directed to consider whether or not there has been significant price undercutting by the foreign goods as compared with the price of like products in the domestic market. The ITC must also consider whether or not the effect of imports significantly depresses prices or prevents price increases. 19 U.S.C. § 1677(7)(C)(ii).

In the instant investigation, the ITC determined price undercutting and price suppression resulted from the imported INC from France. The ITC issued the following statement of reasons for the material injury finding with regard to prices:

> Weighted average prices of nitrocellulose were compared on f.o.b. U.S. point of shipment and delivered bases. While domestic prices increased irregularly during the period from 1980 through 1982, prices of French imports increased at a slower rate for the same period. As noted previously, the cost of goods sold for the domestic producers increased dramatically from 1980 through March 1983; however, domestic prices failed to keep pace with these increases and resulted in losses for the domestic industry.

Purchasing decisions are especially price sensitive on fungible commodities such as the commercially-interchangeable domestic and imported nitrocellulose that is the subject of this investigation. In a survey of firms reporting some purchase of French nitrocellulose, price was mentioned as one of the most important factors in their purchasing decisions. Moreover, in investigating allegations of lost sales, interviews with purchasers confirmed the importance of price in purchasing deci-

11. 19 U.S.C. § 1671d.

sions. Based on the fungible nature of nitrocellulose, together with the demonstrated importance of price in purchasing decisions, the small margins of underselling reported in this investigation are particularly significant.

*Nitrocellulose From France*, Investigation No. 701–TA–190 (Final), USITC Publication 1390, at 7–8 (June 1983) (footnotes omitted).

In support of its determination, the ITC makes substantial reference to the record. The record shows significant changes in underselling in the foreign producer's pricing practices effecting the domestic prices. Underselling occurred in six out of seven quarters during the preliminary investigation and in seven out of thirteen quarters during the final investigation. The ITC determined there were substantial increases in purchases of INC from France by Hercules' customers. The ITC observed these increases forced Hercules to lower its price to meet the French competition, thus resulting in price suppression.

In accordance with the statutory criteria, the ITC is also directed to examine the impact of the imports on the domestic industry. The ITC must evaluate all relevant economic factors having a bearing on the industry which include the following:

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
> (II) factors affecting domestic prices, and
>
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C.A. § 1677(7)(C)(iii)(III) (1982). With regard to impact on the industry, the ITC in its final determination commented as follows:

> Lost sales information developed during the course of this investigation confirmed allegations of sales lost to French imports because of lower prices. Information provided by nitrocellulose customers accounting for over 95 percent of alleged lost sales shows a substantial increase of these customers' purchases of French imports both in absolute terms and as a share of their total nitrocellulose purchases for the period 1980 through 1982. Eleven of the sixteen purchasers contacted indicated that they switched because of the lower price of the French product or more favorable credit terms. Five of these eleven firms switched from Hercules to the French importer as their primary source of supply for nitrocellulose during 1982 when imports were increasing as a share of apparent consumption.

*Nitrocellulose From France*, Investigation No. 701–TA–190 (Final) at 8 (footnotes omitted).

The ITC investigated lost sales data and found French INC was purchased instead of U.S. INC for price related reasons. A significant number of Hercules' lost customers responded price was a significant reason for abandoning Hercules for the French import. The increase in the purchases of French imports by Hercules' customers adversely affected the domestic industry through a loss of sales and decreased prices. It has been observed: "[s]ales lost due to underpricing is an important test of injury in the case of fungible goods [such as INC]." *Gifford–Hill Cement Co. v. United States*, 9 CIT 357, 368, 615 F.Supp. 577, 586 (1985).

Having reviewed the ITC's determination and the facts supporting the determination, the Court concludes the ITC findings are substantiated by the record and are otherwise in accordance with law. SNPE argues Hercules' expansion efforts, its excessive internal costs, and the decline in the domestic market for INC should be considered as the substantial cause of Hercules' material injury. SNPE's alternative view of the record, however, does not supply a sufficient basis for reversing the determination of the ITC. If the ITC finds material injury exists due to an even slight contribution from imports, the ITC may not weigh this contribution against the effects of other factors that are not used in the determination. *Id.* It has been held that

the ITC "is charged only with rationally considering impact on the domestic industry in light of the relevant factors.... '[and] is not required to issue findings and conclusions on an issue concerning a statutory element simply because it was presented by the petitioner.'" *Id.* at 369–70, 615 F.Supp. at 587 (in part, quoting *Jeanette Sheet Glass v. United States,* 9 CIT 154, 161–62, 607 F.Supp. 123, 130 (1985)). If there is substantial evidence to support the ITC's determination, it is not the province of the Court to substitute its own conclusion of the facts for that of the administering agency.

 SNPE concludes its argument by charging the ITC failed to conduct a thorough investigation by: (1) not investigating Hercules' cost increases before determining French imports prevented Hercules from raising prices to cover costs; (2) not obtaining an actual breakdown in each year of the basic cost components; (3) not measuring the reasonableness of cost increases; and (4) not recognizing cost increases caused by internal influences were responsible for Hercules' declining domestic profits. Nothing in the record supports the "lack of thoroughness" allegations of SNPE to remand this determination to the ITC. There appears to be no recognized or statutorily-set minimum standard by which the thoroughness of the investigation is measured. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1561 (Fed.Cir.1984). Furthermore, it bears repeating that "[i]t is within the [ITC's] discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). If there is an inadequate collection of data or a misinterpretation of data which renders the ITC's determination unsubstantiated by the record, or otherwise not in accordance with law, then the reviewing court must either reverse the determination or remand the case. *See Atlantic Sugar,* 744 F.2d at 1562. This situation, however, does not exist in the instant action.

Concerning SNPE's allegation the ITC failed to investigate Hercules' cost increases and to recognize the implications of these increases, this Court has previously discussed the ITC's determination that material injury was by reason of the subsidized imports. The ITC collected and verified information demonstrating the harm was not due to cost increases but rather was due to the subsidized imported merchandise. Data from the questionnaires was sufficient to ascertain Hercules' costs. Nothing in the record reflects a finding that the cost increases were inadequately investigated. That SNPE believes the ITC should draw a different conclusion from the record is not sufficient grounds to reverse or remand the ITC's determination.

SNPE also states the ITC should not have accepted Hercules' cost allocations in lieu of an actual breakdown of costs. According to SNPE, this was the means by which Hercules concealed its reasons for actual cost increases. The ITC defends its investigation arguing that the omission of a detailed breakdown of the cost of goods does not render the record incomplete. It is within the discretion of the ITC to sift through the evidence and make a determination that is reasonable and supported by substantial evidence. The form in which information is received which in this case consisted of fixed percentages rather than an actual breakdown, does not, in and of itself, provide the Court with a basis for finding the ITC's investigative process inadequate.

The ITC requested from Hercules an actual breakdown of individual component costs. Hercules informed the ITC such data was not readily available and stated that the fixed percentages attributable to the individual component costs submitted by it were the only figures available. The ITC verified the fixed percentages as actual data for 1982 and allocated these rates to the total cost of goods sold for the earlier periods. The Court therefore holds the ITC's investigation was adequately conducted with the best information available and did not result in an unreasonable or unsubstantiated determination.

Concerning SNPE's last two challenges of the ITC's analysis of the cost increases, the Court reiterates that the ITC investigation was adequate and diligently undertaken. The ITC's investigation was reasonable, and the resultant determination was substantiated by evidence on the record. The fact that SNPE believes the ITC should have reached different conclusions from its analysis does not provide a sufficient basis for holding the determination was unreasonable. As stated before, "[i]t is within the [ITC's] discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council*, 9 CIT at 300, 613 F.Supp. at 1244. The Court recognizes the following:

> That [SNPE] can point to evidence [on the] record which detracts from the evidence which supports the [ITC's] decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is not the function of a court to decide that, were it the [ITC], it would have made the same decision on the basis of the evidence. Our role is limited to deciding whether the [ITC's] decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." In this case, no basis has been shown for holding the [ITC's] determination unlawful under that limited standard of review.

*Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927, 936 (Fed. Cir.1984) (footnote omitted). Accordingly, the Court affirms the determination of the ITC and dismisses this action.

### III. THE ANTIDUMPING INVESTIGATION

#### A. Introduction

On July 2, 1982, Hercules filed an antidumping petition with Commerce and the ITC alleging industrial nitrocellulose (INC) from France was being sold in the United States at less than fair value and that such sales materially injured or were threatening to materially injure a United States industry. Hercules also alleged sales in the home market were taking place at prices below the cost of production.

After reviewing the petition, Commerce determined there was sufficient information warranting the initiation of an antidumping investigation. On July 14, 1982, Commerce notified the ITC and published notice of its initiation of a preliminary antidumping duty investigation on July 28, 1982. *Initiation of Antidumping Investigation; Industrial Nitrocellulose From France*, 47 Fed.Reg. 32,557 (1982). On August 25, 1982, the ITC published an affirmative preliminary injury determination, finding there was a reasonable indication a United States industry was being, or was threatened with material injury by imports of INC from France. *Nitrocellulose From France*, 47 Fed.Reg. 37,314 (1982).

On November 26, 1982, upon receiving a request from Hercules, the ITC published notice of a postponement of the issuance of a preliminary determination with respect to sales at less than fair value, declaring the investigation extraordinarily complicated. *Industrial Nitrocellulose From France; Postponement of Preliminary Antidumping Determination*, 47 Fed.Reg. 53,441 (1982). The period for making the preliminary determination was extended by 14 days until December 23, 1982 at which time Commerce published a preliminary determination that INC from France was not being sold or was not likely to be sold at less than fair value in the United States. Commerce found the weighted-average margin was 0.43137%, which was determined to be *de minimis. Preliminary Determination of Sales At Not Less Than Fair Value; Industrial Nitrocellulose From France*, 47 Fed.Reg. 57,308 (1982).

Commerce provided opportunity for interested parties to comment accordingly. At the request of the petitioner Hercules, Commerce published a notice, on March 1, 1983, extending the period for making a final determination until May 9, 1983. *Industrial Nitrocellulose From France; Antidumping Investigation; Extension of Period for Final Determination*, 48 Fed. Reg. 8,523 (1983).

Commerce published an affirmative final determination on May 13, 1983, pursuant to section 735(a) of the Tariff Act of 1930, as amended, 19 U.S.C. 1673d(a), that INC from France was being sold in the United States at less than fair value at a weighted-average margin of 1.38%. *Final Determination of Sales at Less Than Fair Value; Industrial Nitrocellulose From France,* 48 Fed.Reg. 21,615 (1983). Commerce then suspended liquidation of all entries of INC from France and notified the ITC of Commerce's determination. On July 23, 1983, the ITC determined the subject imports were materially injuring a United States industry and notified Commerce of this determination. The ITC then published, on August 3, 1983, its affirmative final determination, pursuant to section 735(b)(1) of the Tariff Act of 1930, as amended, 19 U.S.C. 1673d(b)(1), that imports of INC from France were materially injuring a United States industry. *Nitrocellulose From France,* 48 Fed.Reg. 35,186 (1983). In accordance with section 736 of the Tariff Act of 1930, as amended, 19 U.S.C. 1673e and with 19 C.F.R. 353.48, Commerce published an antidumping order on August 10, 1983. *Industrial Nitrocellulose From France; Antidumping Duty Order,* 48 Fed.Reg. 36,303 (1983).

Hercules initiated an action, on September 8, 1983, seeking judicial review and reversal of certain findings in Commerce's final antidumping determination, Court No. 83–09–01324 (LTFV 1324). SNPE followed by filing an action, Court No. 83–09–01325 (LTFV 1325), on October 17, 1982, seeking judicial review and reversal of certain factual findings of Commerce and the ITC resulting in the antidumping order at 48 Fed.Reg. 36,303.

**B. Contentions of the Parties in Court No. 83–09–01325**

In this case, SNPE moves for judgment upon the agency records of Commerce and

the ITC in *Final LTFV Determination.* In its challenge of Commerce's determination, SNPE contends the following:

(1) Commerce failed to grant SNPE an adjustment for differences in levels of trade and such decision is neither supported by substantial evidence on the record, nor is otherwise in accordance with law;

(2) Commerce erred in assigning to INC production the research and development expenses which are tied to other products or product lines exclusively. Such a determination is unsupported by substantial evidence on the record and is otherwise not in accordance with law; and

(3) Commerce's decision to use an accelerated depreciation method instead of a straight-line method is unsupported by the record and unlawful.

The United States defends its determinations arguing the following actions were substantiated by evidence on the record and were otherwise in accordance with law: (1) Commerce's decision not to grant an adjustment for purported differences in the levels of trade at which SNPE sold INC in France and the United States; (2) Commerce's allocation of research and development costs in computing SNPE's cost of production; and (3) Commerce's use of accelerated depreciation in calculating depreciation costs for SNPE's cost of production. Defendant-intervenor SNPE generally concurs with the contentions of the defendant United States.

SNPE also challenges the findings of the ITC's injury determination on substantially the same grounds as it challenged the ITC's injury determination in Court No. 83–07–01075. The Court has already addressed and dismissed the challenges to Court No. 83–07–01075.[12]

**C. Contentions of the Parties in Court No. 83–09–01324**

Plaintiff in this case, Hercules, moves for judgment upon the administrative record of

12. The conclusions of the majority of commissioners regarding the appropriate product and domestic industry were the same in the preliminary and final antidumping and countervailing duty investigations and were adopted in both published views. *See Nitrocellulose From*

*France,* Investigation No. 701–TA–190 (Final), USITC Publication 1390, at 3 (June 1983); *Nitrocellulose From France,* Investigation No. 731–TA–96 (Final) USITC Publication 1409, at 3–4 (June 1983).

Commerce in *Final LTFV Determination.* Hercules' contentions are set forth as follows:

(1) Commerce did not use the "best information available" and erroneously allowed SNPE's finance cost component of costs of production for adjustment purposes to be allocated to the foreign market value resulting in a failure to arrive at a proper determination of whether or not SNPE's cost of production for INC exceeds its home market price. Hercules contends these actions by Commerce are not substantiated by evidence on the record and are not otherwise in accordance with law;

(2) Neither the record nor the law supports Commerce's failure to reject SNPE's alleged allocation of its selling expenses across sales to related customers; and

(3) Commerce's erroneous understatement of SNPE's allocated costs and selling expenses resulted in a lower calculation of the costs of production and ultimately an incorrect calculation of the margin of less than fair value sales.

The defendant United States opposes these allegations and states:

(1) It was reasonable and in accordance with law for Commerce to use SNPE's verified financial statements as the basis for determining cost of production because this information was maintained in accordance with generally accepted accounting principles; and

(2) Commerce properly exercised its discretion and acted reasonably in allocating selling expenses evenly over sales to related and unrelated parties.

Defendant-intervenor SNPE generally concurs with the government's position.

## D. Discussion

### 1. Introduction

The antidumping law is intended to protect domestic industries from the ill effects of foreign merchandise that is sold or is likely to be sold in the United States at less than fair value. 19 U.S.C. §§ 1673 *et seq.* Section 1673 provides:

**§ 1673. Imposition of antidumping duties**

If—

(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise,

then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

19 U.S.C.A. § 1673 (1982).

Commerce has been given broad discretion to administer the antidumping law. Nevertheless, it has been noted that, "while the law does not expressly limit the exercise of that discretion with precise standards or guidelines, some general standards are apparent and these must be followed." *Smith Corona Group v. United States,* 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

■ Upon review of the present action, the Court must sustain Commerce's antidumping duty determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.A. § 1516a(b)(1)(B) (1982). This "substantial evidence test" restricts the scope of the Court's review of the agency record. As previously stated, much deference is given to the agency's interpretation. As long as the interpretation is sufficiently reasonable, it will be

sustained. Furthermore, it need not be the only reasonable interpretation. *Atcor, Inc. v. United States,* —— CIT ——, ——, 658 F.Supp. 295, 299 (1987). In arriving at a clear understanding of the meaning of "substantial evidence," it has been recognized:

> 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Substantial evidence 'is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'

*Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir.1984) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); and quoting *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) respectively).

### 2. Court No. 83–09–01325

In challenging Commerce's *Final LTFV Determination,* plaintiff SNPE claims Commerce erroneously refused to allow an adjustment for alleged differences in levels of trade between the United States and France. SNPE contends a level of trade adjustment is warranted in this situation because sales by SNPE in the United States and France are conducted at different levels of trade including discounted sales to a U.S. distributor, non-discounted sales to French end-users, and discounted sales to French bulk purchasers. SNPE contends the GATT and 19 C.F.R. § 353.19 require adjustments be made for level of trade differences. SNPE criticizes Commerce's interpretation and implementation of the controlling regulation on this issue, 19 C.F.R. § 353.19. SNPE suggests the home market price to French end users should be adjusted by the amount of the discount given on sales to the U.S. distributor, which SNPE believes is the appropriate level of trade adjustment.

Commerce opposes this view and affirmatively defends its decision not to grant the level of trade adjustment as a reasonable employment of Commerce's authority to administer its regulations. Commerce maintains SNPE did not provide any verifiable, credible evidence, or otherwise substantiate its claims to warrant a different conclusion. Defendant-intervenor Hercules agrees with this position.

The regulation at issue, 19 C.F.R. § 353.19, deals with the authority of Commerce to grant level of trade adjustments in the imposition of antidumping duties. The regulation is set forth as follows:

§ 353.19 Level of trade.

The comparison of the United States price with the applicable price in the market of the country of exportation (or, as the case may be, the price to or in third country markets) generally will be made at the same commercial level of trade. However, if it is found that the sales of the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.

19 C.F.R. § 353.19 (1982).

SNPE, in the investigation below, requested adjustment be made to reflect the different levels of trade involved. Commerce refused this request and responded as follows:

> To date, SNPE has not produced information which establishes that a price differential exists in the home market for industrial nitrocellulose or other merchandise of the same class or kind sold at different levels of trade. Such information, if provided, must establish that the differences in the prices are the result of differences in cost of selling at one level of trade as compared to the other. Since no evidence has been received by the DOC which would satisfy the standards of

' § 353.19 of the Commerce Regulations in this regard, we have not made a level of trade adjustment in making our final determination.

*Final LTFV Determination,* 48 Fed. Reg. at 21,617.

SNPE interprets Commerce's response as requiring a "two-prong test" and urges this test led Commerce to arrive at an erroneous determination. SNPE claims this "two-prong test" comprises the following: (1) "no adjustment for different levels of trade will be made unless different levels of trade exist in the home market. . . . [; and 2) ] level of trade adjustment[s must] be measured by the differences in selling costs incurred at different levels of trade [rather than allowing merely] 'appropriate adjustments.' " Plaintiff's Brief in Support of Motion for Judgment Upon the Agencies' Records at 15–16, *Societe Nationale des Poudres et Explosifs v. United States,* Court No. 83–09–01325, Joined Issue Calendar.

As Commerce asserts, it appears SNPE has misinterpreted Commerce's rationale for disallowing an adjustment. Before considering the agency's alleged "test," it is necessary to consider the opening words of Commerce's statement: "To date, SNPE has not produced information which establishes that a price differential exists. . . . at different levels of trade." 48 Fed.Reg. at 21,617. The regulation is also clear that "appropriate adjustments will be made for differences affecting price comparability." 19 C.F.R. § 353.19.

In determining whether or not to grant a level of trade adjustment, Commerce must look to "differences affecting price comparability." Where SNPE does not provide Commerce with any substantiating evidence of differences "affecting price comparability," including cost differences, Commerce has an inadequate basis for which to grant a level of trade adjustment. SNPE contends the following establish a level of trade differential that requires an adjustment: (1) different levels of trade exist in the foreign and domestic sales of INC; (2) discounts were offered to the U.S. distributor; and (3) while end-users were

the only purchasers in France, there was a distributor-purchaser of INC in the U.S. SNPE requests adjustment based on a difference in selling costs but does not provide Commerce with substantial evidence concerning the "affected price comparability."

Commerce cannot adjust prices for level of trade differences in the absence of quantifying evidence to substantiate the request. This appears to be a practice consistently followed by Commerce. *See Pig Iron From Canada; Final Results of Administrative Review of Antidumping Finding,* 46 Fed.Reg. 39,871, 39,872 (1981); *Antidumping—Precipitated Barium Carbonate From the Federal Republic of Germany; Final Determination of Sales at Less Than Fair Value,* 46 Fed.Reg. 25,494, 25,495 (1981); *Melamine in Crystal Form from the Netherlands; Antidumping: Dtermination [sic] of Sales at Less Than Fair Value,* 45 Fed.Reg. 20,152, 20,152–53 (1980); *Antidumping: Marine Radar Systems From the United Kingdom; Determinations of Sales at Less Than Fair Value,* 44 Fed.Reg. 49,322, 49,323 (1979), and subsequent cases, *see Low–Fuming Brazing Copper Rod and Wire From New Zealand; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed. Reg. 31,405, 31,406 (1985); *Final Determination of Sales at Less Than Fair Value; Portland Hydraulic Cement From Australia,* 48 Fed.Reg. 41,056, 41,057–41,058 (1983).

Commerce's position in this regard has been aptly stated as follows:

We recognize that in certain circumstances, where sales are made at different levels of trade, an adjustment for such differences may be appropriate. However, we are unable to make such an adjustment in the instant case since we have been provided with no information establishing the price differential which would exist were there sales in Canada at the distributor level. In considering whether to make a level of trade adjustment, we cannot assume that cost differences associated with sales made at different levels of trade

may reasonably be expected to result in price differences. In order to establish that there are differences which affect price comparability, information substantiating that the differences in the prices are the result of differences in the cost of selling at one level of trade as compared to the other must be submitted. Since the information provided is not sufficient to substantiate respondent's claimed cost-based adjustment, we did not make an adjustment.

*Certain Tapered Journal Roller Bearings and Parts Thereof From Italy; Final Determination of Sales at Less Than Fair Value*, 49 Fed.Reg. 2,278, 2,280 (1984).

■ The Court finds the position of Commerce is reasonable. When sales are made at different levels of trade, information submitted in support of a request for a grant of a level of trade adjustment must satisfactorily show that the different levels of trade in the home market and United States market affect price comparability. If the correlation between levels of trade and quantity sold in the subject markets is not substantially supported by the submitted evidence, then the claimed adjustments may be examined by the agency to see if they have been adequately quantified on the basis of cost differentials. *Silver Reed America, Inc. v. United States*, 7 CIT 23, 32, 581 F.Supp. 1290, 1296 (1984), *rev'd on other grounds sub nom. Consumer Products Div. v. Silver Reed of America, Inc.*, 753 F.2d 1033 (Fed.Cir. 1985), *CIT remand order vacated, Silver Reed America, Inc. v. United States*, 9 CIT 221 (1985).

■ In this case, Commerce was not provided with substantial evidence of quantified price *or* quantity differentials affecting the price comparability which would support SNPE's claim for level of trade adjustments. SNPE merely states it makes sales at different commercial levels of trade and that a discount offered on sales to a U.S. distributor should be the sole proof of affected price comparability and should establish the measure for a

price differential. There is no evidence to support SNPE's claim the U.S. discount is a measure of a cost difference or that a quantified differential exists at different levels of trade. A level of trade adjustment is designed to compensate for differences in prices of products sold in different markets at different levels of trade. Here, SNPE has not established substantial differences to warrant a finding that Commerce's determination was unreasonable, unsubstantiated, or unlawful.

■ An administrative agency endowed with the authority to promulgate regulations is given broad discretion in the exercise of its expertise to interpret and implement those regulations. *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984); *United Electrical, Radio and Machine Workers of America v. United States*, ___ CIT ___, ___, 669 F.Supp. 467, 471 (1987). Similarly, it has been stated that "19 U.S.C. § 1677b(a)(4)(B) grants Commerce broad discretion in determining whether a circumstances of sale [i.e. different levels of trade] warrants an adjustment in foreign market value." *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 529, 622 F.Supp. 1071, 1079 (1985). It is this Court's duty upon review of a determination by Commerce which interprets and implements a regulation and to sustain the determination if "it is [not] plainly erroneous or inconsistent with the regulation." *Mast Industries, Inc. v. United States*, ___ CIT ___, ___, 652 F.Supp. 1531, 1538 (1987), *aff'd*, 822 F.2d 1069 (Fed. Cir.1987) (citation omitted).

Under the instant circumstances and in light of various Commerce determinations and cases, substantial evidence supports Commerce's interpretation and implementation of its regulation. It does not appear Commerce has constructed a two-prong test that is contrary to the statute. Commerce did not require both levels of trade exist in the home market, but rather required SNPE to prove its claimed cost differentials. Commerce's requirement of proof, specifically proof of cost differences, did not run counter to the statute. Although Commerce's position was not ex-

pressed as clearly as it could have been, this does not, in and of itself, constitute a basis for the Court to reverse and remand the determination.

SNPE also complains Commerce wrongfully rejected SNPE's submitted information concerning research and development (R & D) expenses and instead utilized data of SNPE's R & D allocation costs in GOF contracting arrangements. SNPE argues its submitted information more accurately reflects the costs attributable to R & D for INC. SNPE urges Commerce base its decision on this alleged proof of actual costs rather than estimates, approximations, or averages emanating from the GOF contract allocation methodology.

Commerce claims it relied on SNPE's verified financial statements for its computation of SNPE's R & D costs for INC. Commerce maintains it rejected SNPE's submission because the data was a deviation from SNPE's normal accounting methods and had been reallocated specifically in response to the antidumping questionnaire. Commerce contends there was no verifiable evidence presented by SNPE in the record to substantiate SNPE's special allocation of R & D expenses. Commerce therefore utilized SNPE's normal financial statements, which were certified as consistent with generally-accepted accounting principles (GAAP). According to Commerce, the financial statements were the best information available for computation of the R & D portion of the cost of production.

In the final antidumping investigation, SNPE challenged Commerce's allocation of R & D expenses to INC production costs. Commerce responded as follows:

> In their response, SNPE deviated from their normal accounting practice by adjusting the R & D allocations to industrial nitrocellulose to exclude R & D they believe to have been associated with other product groups. [Commerce] accepts the accounting allocations of the responding firm for general, administrative and selling expenses as long as those allocations are the usual accounting practices of the respondent and are acceptable to [Com-

merce]. Consequently, we have recomputed the allocation for R & D in accordance with SNPE's normal accounting practices by spreading the R & D expenses over all products and have used this figure in calculating the cost of production for our final determination.

*Final LTFV Determination*, 48 Fed. Reg. at 21,617.

In antidumping investigations, Commerce will determine the foreign market value of imported merchandise under investigation on the basis of constructed value whenever there is reasonable belief the price of the merchandise sold in the country of exportation is less than the cost of production. 19 C.F.R. § 353.7 (1982). ("The cost of production will be computed on the basis of the best available information of costs of materials, labor and general expenses....") The regulation provides that constructed value "shall be determined, from the best available information, by adding—(1) The cost of materials ...; (2) An amount for general expenses and profit ...; and (3) The cost of all containers...." 19 C.F.R. § 353.6 (1982); *see* 19 U.S.C. § 1677b(e) (1982). R & D expenses are considered general expenses. Pursuant to 19 U.S.C. § 1677b(e), Commerce calculated the foreign market value of INC in the *Final LTFV Determination* by use of the constructed value method. 48 Fed. Reg. at 21,616.

Pursuant to the statute and regulations, Commerce generally determines cost of production by use of the best available information. Upon compiling the best available information, Commerce is given broad discretion in verifying, scrutinizing, and interpreting the data in order to formulate its determination. It is clearly within Commerce's "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985).

In calculating cost of production Commerce will use the normal financial statements and records of the foreign exporter,

except in cases where the circumstances and information cast reasonable doubt on the accuracy of actual costs. This includes situations in which costs are not accounted for according to the GAAP of the foreign exporter's country. *See Final Determinations of Sales at Less Than Fair Value: Hot-rolled Carbon Steel Plate and Hot-Rolled Carbon Steel Sheet From Brazil,* 49 Fed.Reg. 3,102, 3,105 (1985); *Fresh Cut Roses From Columbia; Final Determination of Sales at Less Than Fair Value,* 49 Fed.Reg. 30,765, 30,766 (1984); *Lightweight Polyester Filament Fabrics From the Republic of Korea; Final Determination of Sales at Less Than Fair Value,* 48 Fed.Reg. 49,679, 49,683–84 (1983); *Certain Iron Metal Castings from India; Antidumping: Final Determination of Sales at Not Less Than Fair Value,* 46 Fed.Reg. 39,869, 39,871 (1981).

 Commerce chose SNPE's verified financial statements regarding SNPE's accounting practice of allocating the R & D expenses to all products. This practice was governed by pricing guidelines in the GOF government contracts. Commerce did not accept data submitted by SNPE but looked to normal allocations of R & D expenses as recorded in SNPE's books. Commerce experienced enormous difficulty with SNPE's submitted information. SNPE made special efforts to readjust and reallocate the R & D data. In response to Commerce's questionnaire, R & D costs which had previously been attributed to all products, were excluded from the calculated costs of INC production. The clear result of this action was to reduce INC R & D costs. Independent auditors hired by Commerce for the investigation found SNPE's methodology as well as its proposed special allocations of R & D expenses unreasonable and unverifiable. Furthermore, SNPE did not provide evidence to substantiate its adjusted allocations. There was insufficient evidence supporting SNPE's claimed R & D expenses with respect to specific products.

On the other hand, SNPE's normal financial statements, which were utilized by Commerce, were certified and verified by the investigating teams and found by Commerce to be consistent with GAAP. The verification teams were able to calculate SNPE's R & D costs based on SNPE's financial statements and the employed allocation methodology.

In computing fair value in antidumping investigations, Commerce has great flexibility in employing its expertise. *Southwest Florida Winter Vegetable Growers Ass'n v. United States,* 7 CIT 99, 107, 584 F.Supp. 10, 18 (1984). That the petitioner is able to produce evidence, albeit unverified, in support of its own contentions and in opposition to the evidence supporting the agency's determination does not in and of itself demand reversal or remand of the agency's determination. It is the duty of the reviewing court to scrutinize the agency's decision and determine whether or not it is supported by substantial evidence on the record and is otherwise in accordance with law. *Matsushita Electric Industry Co., Ltd. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984). Commerce's decision to utilize verified information rather than SNPE's proposed allocation methodology was a reasonable decision in accordance with the broad discretionary powers vested in Commerce.

██ SNPE's last contention is Commerce erred in using an accelerated depreciation tax method rather than straight-line methodology in calculating SNPE's depreciation costs. SNPE argues that although it uses an accelerated depreciation method for tax purposes, this methodology does not accurately reflect SNPE's actual costs and therefore should be replaced with straight-line methodology for a more accurate computation.

Commerce defends its position much in the same way it defended its determination concerning R & D expenses:

> In their response, SNPE deviated from their normal accounting pactice [sic] by calculating depreciation on a straight-line basis. [Commerce] accepts the usual accounting practices of a respondent as long as those practices are acceptable under the Generally Acceptable Accounting Principles in the country of production. A respondent

may not deviate from its normal accounting practices unless [Commerce] determines that their standard methodology is inappropriate. Since this is not the case, [Commerce] has used the accelerated method in calculating depreciation costs as reflected in SNPE's financial statement.

*Final LTFV Determination,* 48 Fed. Reg. 21,617.

Commerce urges it was SNPE's duty to come forth with verifiable substantiating evidence to support its claim that depreciation costs were more accurately calculated by straight-line methodology. Commerce utilized SNPE's normal financial records and statements, which were consistent with the GAAP, in order to measure the tax costs. Commerce alleges SNPE failed to produce substantial evidence contrary to Commerce's findings which would warrant the use of a different methodology.

Commerce's decision to calculate the cost of production from the petitioner's normal financial statements maintained in conformity with the GAAP was a reasonable exercise of its discretionary powers in the absence of substantiating evidence that this methodology was a deviation or misrepresentation of SNPE's costs. SNPE, in its financial statements and records, employed an accelerated depreciation methodology in computing cost of production for French tax purposes. However, SNPE altered its methodology for depreciation purposes to a straight-line methodology when it submitted its questionnaire response to Commerce. This alteration resulted in a more favorable outcome to SNPE. Furthermore, SNPE failed to provide sufficient evidence to show Commerce's choice of accelerated depreciation distorted the depreciation costs.

Commerce's verification reports, on the other hand, provide substantial evidence to support Commerce's findings. Where the reviewing court is faced with two opposing views of the record, that of Commerce and that of the petitioner, it is the function of the Court to uphold the determination of the agency if it is substantiated by evidence on the record and is otherwise in accordance with law. The Court holds the determination by the agency, in this case, was supported by substantial evidence on the record and was otherwise in accordance with law. Commerce chose the best information available, i.e., the verified financial statements and records. These documents established SNPE's standard procedure was to employ the accelerated depreciation method. The other option for Commerce was to adopt SNPE's unverified allegations that straight-line depreciation methodology would more accurately reflect the actual costs. The record supports Commerce's decision.

**3. Court No. 83–09–01324**

Plaintiff Hercules, pursuant to Rule 56.1 of the Rules of this Court, moves for judgment upon the administrative record in this action, challenging certain aspects of the *Final LTFV Determination* by Commerce. Hercules urges this Court remand this matter to Commerce for a new determination because Commerce's first determination, although correctly finding INC from France was being sold by SNPE at less than fair value, was nevertheless erroneous in calculating the cost of production. The result according to Hercules was a lower calculated margin of less than fair value sales.

 The antidumping statute requires the ITA compare United States price to foreign market value to determine whether a foreign manufacturer is dumping its products in the United States and at what margin. *See* 19 U.S.C. § 1673 (1982). Foreign market value may be based upon the home market price, third country price, or constructed value. *See* § 1677b (1982). The ITA must disregard any sales in the home market if it finds that the price was below the manufacturer's cost of production (COP). 19 U.S.C. § 1677b(b) (1982); 19 C.F.R. § 353.7 (1982). If remaining sales are inadequate to form a basis for calculating foreign market value, the ITA is required to use constructed value. *Id.*

The statute does not establish criteria for determining the COP, but does provide, along with Commerce's regulations, that

COP will be based on the costs of materials, labor, and general expenses. 19 U.S.C. § 1677b(e)(1), 19 C.F.R. § 353.7(b). Included in general expenses are both finance and selling costs. Hercules claims Commerce incorrectly calculated these costs, resulting in a lower COP amount. Hercules argues had this error not occurred, Commerce's calculation would have produced a COP which would have exceeded the home market price. As such, Commerce would have used a constructed value rather than home market price as the basis for calculating the foreign market value of certain grades of INC. The Court finds Commerce's calculation of finance and selling costs was reasonable. The determination by Commerce is therefore sustained.

■ Commerce verified and accepted SNPE's allocation of its finance costs across all its products on a value added basis. Hercules argues SNPE should not have allocated finance costs equally over all products because there is evidence in the record SNPE actually incurred higher finance costs for producing INC than an equal allocation reflects. Hercules refers to the evidence of credit costs submitted by SNPE. These costs were significantly higher for INC than were the allocated finance costs submitted by SNPE. Essentially it is Hercules' position if SNPE claimed as an adjustment to foreign market value the cost incurred by SNPE extending credit to home market purchasers, Commerce must conclude these same costs are included in SNPE's cost of financing the production of INC.

The connection Hercules attempts to make between credit costs and finance costs is ill-founded. Commerce's policy on COP and constructed value principles is set forth as follows:

> All costs used in calculating COP or constructed value should be (1) based on the actual costs incurred by the company in question, and (2) valued in accordance with generally accepted accounting principles for the product under investigation. They should not be based upon "imputed costs" or "oppor-

tunity costs," as such terms are used in economic theory.

U.S. Department of Commerce, *Summary of COP & Constructed Value Principles*, Policy Paper Number 47, at 3 (1982) (footnote omitted).

Therefore, the costs to be included, by Commerce, in COP or constructed value computations, do not include imputed or opportunity costs. Such imputed or opportunity costs include instances in which companies extend credit to purchasers. *See* U.S. Department of Commerce, *Treatment of Opportunity Costs in COP Cases*, Policy Paper Number 16 (1982). When SNPE extends credit to home market purchasers, it loses the opportunity of otherwise investing the money and receiving a return on the investment. Nevertheless, such imputed or opportunity costs are not properly included in Commerce's calculation of COP.

Extension of credit to purchasers of goods is not treated as an actual cost. As stated above, such costs are merely opportunity or imputed costs. Consequently, SNPE's extension of credit to purchasers of SNPE's goods was not included in the cost of production analysis. This analysis is designed to ascertain the actual costs incurred by the manufacturer. *See* 19 U.S. C. § 1677b(e). Therefore, it was proper for Commerce not to have taken into account the costs of extending credit to purchasers when computing the finance costs for the COP calculations.

■ Hercules argues Commerce's determination concerning the cost of borrowing to SNPE erroneous. However, Commerce reasonably relied upon SNPE's allocation of its actual borrowing costs across its entire product line. Commerce's regulations provide for the use of the best information available in computing the actual costs of production. 19 C.F.R. § 353.7(b). Commerce accepted SNPE's finance cost figures as reflected in SNPE's financial statements and records because these records were verified and certified by independent sources as being consistent with the GAAP. The finance expenses, as well as other general costs, were verified to be in conformity with SNPE's balance sheet.

SNPE's financial statements did not distort actual costs or misrepresent SNPE's finance costs. Commerce's choice of information was consistent with its usual practice. *See Final Determination of Sales at Less Than Fair Value: Hot-rolled Carbon Steel Plate and Hot-Rolled Carbon Steel Sheet From Brazil*, 49 Fed.Reg. 3,102, 3,105 (1984). Hercules produced inadequate evidence to establish Commerce's determination was unsubstantiated by the record or otherwise not in accordance with law. Review of a determination by the Court is limited: "Under present law it is not for the Court to impose its preferred choices on Commerce with respect to the sufficiency of its investigation or the wisdom of its methods so long as there is support in the record as a whole for its determination and its methods are in accordance with law." *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 524, 622 F.Supp. 1071, 1075 (1985). The Court finds there was support in the record for Commerce's decision to utilize the finance costs contained in SNPE's verified financial statements as the best information available to compute cost of production. Commerce's decision was therefore in accordance with law.

■ Commerce accepted and verified the selling expenses reported by SNPE. In its calculations of COP, Hercules attributed these expenses solely to INC and allocated them evenly to sales to related and unrelated parties. Hercules argues Commerce should have rejected SNPE's allocation of INC selling expenses to remain consistent with Commerce's practice of excluding SNPE's prices of sales to related customers as sales not sufficiently held at arm's length. Hercules contends Commerce should not have used these prices to determine foreign market value pursuant to 19 C.F.R. § 353.22(b). Commerce defends its decision as a reasonable action within its bounds of discretion, having verified the statements and having little evidence to find differently. This Court agrees Commerce reasonably exercised its discretionary authority.

Hercules contends that since sales to related purchasers are taken into account when computing home market price, such sales must also be considered when computing COP. Hercules employs reference to 19 C.F.R. § 353.22(b) as support for its contention. Section 353.22(b) sets forth guidelines in determining foreign market value as it applies to transactions between related parties:

(b) *Sales to related persons.* If such or similar merchandise is sold, or in the absence of sales, offered for sale in the home market or, as appropriate, to third countries, to a person related to the seller of the merchandise in any of the respects described in section 771(13) of the Act, the price at which such or similar merchandise is sold or, in the absence of sales, offered for sale to such person *ordinarily will not be used in the determination of foreign market value* unless such sales are demonstrated to the satisfaction of the Secretary to be at prices comparable to those at which such or similar merchandise is sold to persons unrelated to the seller.

19 C.F.R. § 353.22(b) (1982) (emphasis added).

Commerce contends the applicability of § 353.22(b) upon the instant issue is minimal at best. Section 353.22(b) only applies to home market or third country sales. It is not applicable in guiding Commerce in determining constructed value or COP. Furthermore, § 353.22(b) generally requires rejection of sales to related parties as a basis for foreign market value unless such sales are shown to be at prices comparable to unrelated parties. This standard is wholly dissimilar to that which is employed in determining COP and constructed value, which allow, inter alia, the calculation of general expenses, of which selling expenses, direct or indirect, are included. *See* 19 U.S.C. § 1677b(e); 19 C.F.R. § 353.7(b); 19 U.S.C. § 1677b(e)(1)(B); 19 C.F.R. § 353.6(a)(2); *Certain Electric Motors from Japan: Final Results of Administrative Review of Antidumping Duty Order*, 49 Fed.Reg. 32,627, 32,631 (1984) ("We define the term general expenses as 'general, administrative and selling' expenses in-

curred in selling the same general class or kind of merchandise *in the home market* ").

Commerce, in the absence of a definition of general expenses in § 353.7(b) as it refers to COP, relies upon 19 U.S.C. 1677b(e)(1) pertaining to the calculation of constructed value. This subsection provides as follows:

> (2) **Transactions disregarded; best evidence.**—For the purposes of this subsection, a transaction directly or indirectly between persons specified in any one of the subparagraphs in paragraph (3) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise under consideration. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subparagraphs in paragraph (3) of this section.

19 U.S.C.A. § 1677b(e)(2) (1982) (paragraph 3 sets forth what constitutes "related parties").

Commerce argues § 1677b(e)(2) grants Commerce discretion in considering related party transactions when calculating constructed value. Commerce argues it "may" disregard sales to related parties in constructing the indirect sales expense cost when those sales figures do not "fairly refect the amount usually reflected in sales in the market under consideration of merchandise under consideration." *Id.* In further support of its argument, Commerce cites the implementing regulation of § 1677b(e)(2), which is 19 C.F.R. § 353.6(b), and which provides "[d]irect or indirect transactions between related parties ... may be disregarded [where the proper amount is not fairly reflected]." 19 C.F.R. § 353.6(b) (1982). This interpretation by Commerce appears to be reasonable. *Cf. Certain Electric Motors from Japan; An-*

*tidumping: Final Determination of Sales of Large Motors at Less Than Fair Value and Suspension of Investigation for Small Motors,* 45 Fed.Reg. 73,723, 73,726 (1980) (general expenses examined as elements of loss in related party transactions).

The record supports Commerce's determination to accept SNPE's INC selling expenses that were evenly allocated over sales to related and unrelated parties. Commerce properly exercised its discretionary powers in accordance with a reasonable interpretation of its regulations with regard to the calculation of selling expenses in a COP analysis. The accepted information was verified as reliably reflecting the cost element in question. Commerce had no reason to ascertain whether or not selling expenses from sales transacted with related customers were significantly lower than those expenses from sales to unrelated parties, either from the record or from Hercules unsubstantiated allegations. It has been held Commerce's implementation of its statutory authority shall be sustained by this Court unless it was done unreasonably or contrary to the statute. *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984).

The Court finds Commerce's calculations of SNPE's cost of producing INC with respect to the finance and selling costs were reasonable, substantiated by the record, and in accordance with law. Accordingly, the determination and calculation of the antidumping margin is sustained.

## CONCLUSION

In accordance with the Court's opinion set forth above, the final countervailing duty and antidumping determinations of Commerce and the ITC are sustained. The respective motions by SNPE and Hercules for judgment on the agency records are denied, and all actions are hereby dismissed.

Judgment will be entered accordingly.